## DESTRUCTOR CO. v. CITY OF ATLANTA.

(District Court, N. D. Georgia. October 15, 1914.)

No. 53.

1. COURTS ☞347—PROCEDURE—MOTION TO DISMISS.

A motion to dismiss a bill in equity under the new equity rules must be considered as admitting, for the purpose of the motion, the truth of everything alleged in the bill that is well pleaded, as in the case of a former demurrer.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. ☞347.]

2. MUNICIPAL CORPORATIONS ☞254—CONTRACTS—PERFORMANCE—REMEDY.

Where complainant contracted to build an incinerating plant for defendant city for a specified price, the final payment to be due when the plant was in successful operation as shown by tests provided for—one at a time fixed by complainant, and the other at a time to be agreed upon between complainant and the city, within six months after the plant was ready for useful operation—a bill alleging that the plant had been completed, but that the city refused to pay or participate in the tests, stated a cause of action for equitable relief; complainant being absolutely entitled under its contract to have the tests made.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 696–700; Dec. Dig. ☞254.]

3. MUNICIPAL CORPORATIONS ☞254 — CONTRACTS — PERFORMANCE — ACTS OF MAYOR.

In a suit against a city to compel performance of a contract to purchase and pay for an incinerating plant erected by complainant, allegations of the bill, reciting acts and conduct of the mayor personally ad-

verse to complainant and not within his official capacity, were improper and would be stricken.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 696–700; Dec. Dig. 254.]

In Equity. Suit by the Destructor Company against the City of Atlanta. On motion to dismiss the bill. Denied.

Evins, Spence & Moore, of Atlanta, Ga., and Martin, Fraser & Speir, of New York City, for plaintiff.

James L. Mayson and W. D. Ellis, Jr., both of Atlanta, Ga., for defendant.

NEWMAN, District Judge. This is a bill in equity filed by the plaintiff against the defendant. The present hearing has been on a motion made by the defendant to dismiss the bill.

The bill, after the necessary jurisdictional averments, sets out that on July 9, 1913, the Destructor Company made a contract with the city of Atlanta for the erection by the company of a plant for the destruction of the city's refuse. That contract, consisting of several documents, is attached.

It is further alleged: That about a year before this contract was made the company had made a previous contract with the city providing for the erection by the company of substantially the same plant and an electric generating plant for the utilization of the steam produced. That this contract had been made with a previous city administration and had been based upon a practice which had then been current in the city of Atlanta for many years under which one city administration, in making contracts for important public works, pledged the moral obligation of the city to fulfill them in part during the succeeding administrations. That a suit was instituted against the city and the Destructor Company, in the superior court of Fulton county, to have this contract declared illegal and invalid. That the superior court held the contract to be legal, and the case was taken to the Supreme Court of the state, which reversed the decision of the lower court and declared the contract illegal as being beyond the power of the city government. When this decision was announced, the Destructor Company had done a large part of the work of erecting the plant, under the first contract, and on the city's land, relying in good faith on the advice of counsel of both the city and the company that the contract was legal and that the city would fulfill the moral obligation to perform it, and had expended large sums in such performance, but had received no payments from the city. That in this situation the present contract was made. It differed from the previous contract mainly in cutting out the electric generating plant, and thus making no provision for the utilization of the surplus steam produced in the operation of the plant, reducing the contract price, which was $274,750 plus about $8,000 for extras allowed for excavation and foundation, by over $22,000, to the sum of $260,000, and providing that this reduced price be paid $125,000 cash upon the execution of the new contract and the balance of $135,000 when the plant was completed and proved by tests as prescribed in the

specifications to meet all requirements. That the $125,000 was paid by the city to the company under the present contract, but the payment was delayed by the mayor about 30 days after the agreement as to terms had been reached. That on the signing of the present contract the company entered upon the work of completing the plant, and, in accordance with the terms of the contract, the plant was ready for useful operation by August 15, 1913, and the company thereupon notified the city that the plant was so ready. That the city, a few days later, began regular delivery of the city's refuse at the plant, and the company has been operating the plant ever since and has kept the plant in continuous operation and destroyed all of the city's refuse which has been brought to the plant, with a few unimportant exceptions.

It is then alleged that the contract contains certain guaranties of performance in the matter of capacity, steam production, etc., and provides that the fulfillment of these guaranties shall be determined by tests of 24 hours' duration, with a refuse mixture of certain specified proportions. The contract provides that the first test shall be made at a time fixed by the company and the second test at a time to be agreed upon between the city and the company, within six months after the plant was ready for useful operation.

Certain clauses in the contract are then quoted, which relate to the right of the company to make changes in the incinerator if by doing so it may be made to satisfactorily fulfill the requirements of the guaranty, and with reference to the work being done to the satisfaction of the city of Atlanta and with reference to the percentage of garbage, stable manure, ashes, and rubbish of which the refuse of the city of Atlanta is represented approximately to consist and that the plant was built by the company to burn substantially the proportions of the substances to be furnished as stated; that the proportions in the refuse so furnished was not in accordance with that provided in the contract, but varied extremely therefrom.

It is then alleged that the company, on finding the actual condition so very different from those represented by the city and specified in the contract, to meet which the plant had been designed, did not lie back and claim that under the contract the plant need only burn refuse of the composition represented by the city, but, on the contrary, the company spent every possible effort and a large amount of its own money to make such changes in the plant as were needed to make it meet guaranties under actual conditions; and that, furthermore, the company has made these changes under the extra difficulty of all the time keeping the plant in operation and burning the city's refuse; that the expense and effort of installing the needed changes would have been very much less had the company shut down the plant to make the changes.

It is then alleged that the company, at the time the bill was filed, had fulfilled its contract with the city, and that on August 8, 1914, on a test of the crematory plant, it complied with all the guaranties and requirements of the contract. It is then alleged that the city refused to pay, and still refuses to pay, the balance due.

. It is alleged that, after the plant was completed and in operation and the city's refuse being delivered, the company, in pursuance of its right

under the contract, wrote the city that the company would be ready to run the first test in the early part of the week beginning December 29, 1913, and requested the city to make arrangements accordingly to deliver at that time refuse of the quantity and character called for by the contract for the test, and that the city refused to have the official test made at that time or to supply the refuse for it; that this refusal prevented the running of the first test; that the city has been request-- ed by the company to reconsider its former action, and on January 5, 1914, a request was made on the mayor and general counsel for the city to co-operate in running a test; that arrangements had been made for running a test at the time the severe storm occurred on February 13, 1914, but the test was prevented by the fact that ice covered the streets of Atlanta to such an extent that it was impossible to collect the material for the test. It was then postponed until February 17th, and at that time the refuse at the plant, as the allegations are understood, was insufficient for a test, and during the next few days the requisite material for a test was not furnished.

It is alleged that the company persistently tried to have a test run, and a test was finally agreed upon on March 14th, and it was accordingly run on that day. On this test the crematory satisfactorily destroyed all the refuse but fell 10 per cent. short in the amount destroyed in 24 hours. That is, the contract provided for the destruction of 250 tons in 24 hours, and the plant destroyed 225 tons.

It is then alleged that after this test the company, as permitted by the contract, made certain slight changes in the equipment of the furnaces, so as to make them better fulfill both the requirements and the guaranties of the contract, and also meet the actual conditions prevailing in Atlanta. After stating that the company had great difficulty in making the necessary changes and keeping the plant in operation at the same time, and after alleging certain correspondence with the mayor and a personal interview between the president of plaintiff company and the mayor, the bill proceeds to state that it was agreed for a test to be made on August 8, 1914, and the required material was accordingly gathered and brought to the plant for the test on that date. The further allegation on this subject is as follows:

"The guaranteed capacity of the plant is 250 tons per 24 hours, of refuse containing 15 per cent. of ashes. Within 24 hours of the time agreed upon for beginning the test, the city delivered at the plant 284 tons of practically pure garbage, containing almost no ashes. To incinerate this material it was necessary to add 30 tons of ashes which the company had collected at its own expense. There was also about 20 tons of material in the pit. At the plant rating, this 334 tons of material, which was an overload of 84 tons of its daily capacity, would require 32 hours to incinerate; but because it had not been disposed of in 28½ hours the mayor refused to take part in the test. The test, however, was run. Although the proper mixture of material had been collected, the city, during the first four hours of the run, delivered 61 per cent. of garbage, six tons of which was pure watermelons, and only 39 per cent. of rubbish and ashes—instead of 50 per cent. of rubbish and ashes as specified. The city also refused to deliver into the pit over 139 tons of material, and the company was obliged to deliver as much of the remaining tonnage as possible at its own expense. It was impossible to get the full amount, and over 50 tons of pure garbage, instead of test mixture, had to be used to complete the test. This test was run by Gabriel R. Solomon, Esq., of the Solomon-Norcross Com-

pany of Atlanta, an unbiased engineer employed to run an impartial test. His report shows that the test showed compliance with all the guaranties and requirements of the contract."

In an amendment recently filed to the pleadings, it is alleged that at the time the original bill was filed herein, to wit, August 19, 1914, complainant had fulfilled its contract which it had with the city of Atlanta, and that:

"On the test of said crematory plant held on August 8, 1914, the plant complied with the guaranties and requirements of said contract."

So, as I understand the bill, it is now clearly alleged that, while at the test made on March 14, 1914, the plant lacked 10 per cent. of destroying the amount of material required by the contract, thereafter certain changes were made which brought the plant up to the required capacity.

The substance of the other allegations is that, the plant having now been completed in compliance with the contract of the Destructor Company with the city, the company asks for another test, and, if the plant fails in any way to comply fully and strictly with the contract, it be allowed reasonable opportunity to make such changes as will remedy defects and bring the plant up to every requirement of the contract. It is alleged that the city refuses to accept the plant, although it is continually using the same and has been since August 13, 1913, and also that the city refuses to pay the remaining $135,000.

The prayers are:

(1) For an injunction restraining the city from taking possession of the plant until it has paid the amount due under the contract.

(2) For a receiver to take charge of the plant and operate it.

(3) That the receiver be instructed to afford the company every reasonable opportunity to install at its own expense such improvements as it may deem necessary to increase the efficiency of the plant.

(4) That the plaintiff's interest in or lien upon the plant be declared, protected, and enforced by foreclosure of the lien or otherwise.

(5) That in order to do complete justice the court may determine the amount due the plaintiff for building the plant, and decide by running a test whether the company has complied with its contract, and, if not, give it reasonable opportunity to make such improvements and run such further tests as shall show that the plant complies with all the guaranties of the contract and that the contract be specifically enforced in this respect.

(6) That, if necessary, the provision of the contract for the settlement of all disputes by arbitration be enforced by the running of a fair test by arbitrators under the court's supervision.

(7) That an accounting be had as to the amount due the company from the city for the building and operation of the plant and the extra expenditures caused the company, for which the city is responsible.

(8) That the final amount due from the city having been determined, and the amount realized by the foreclosure of the company's lien having been applied thereon, a judgment for the deficiency be given against the city.

Then for subpœna and general relief.

[1] There is a motion to dismiss this bill on various grounds. Of course, a motion to dismiss, under the new equity rules, must be considered in the same way a demurrer would be; that is, it concedes, for the purpose of the motion to dismiss, the truth of everything alleged in the bill that is well pleaded.

The first four grounds of the motion to dismiss are that the court will not appoint a receiver for the company's plant on its own request.

As the court has no purpose at present of appointing a receiver, it is unnecessary to consider these grounds.

The next is on the ground that there are no mutual accounts, and therefore, so far as it is a bill for an accounting, it should not be sustained.

It is doubtful if this prayer for an accounting would be sufficient to sustain the bill, except as it is intermingled with other matters in the bill.

The next ground is that the charge that complainant has a lien is not sustained by the allegations of the bill. It is said that no contract lien is pleaded and that no statutory lien is shown to exist.

[2] This is a peculiar case in this respect. The plant in question is devoted, by the city, to a public use, and consequently there could probably be no enforcement, by execution, or otherwise, of any judgment the plaintiff might obtain, against this particular property. This plant is built on property belonging to the city and has been built at large expense and under the supervision of the city, in accordance with the contract. It must be assumed from the allegations of the bill, and indeed it was stated by counsel for both plaintiff and defendant, in open court, that a fund is now set apart and available to pay for this plant when the Destructor Company has fully complied with its contract and it stands the tests required. When this contract has been fully complied with and the plant stands the tests prescribed, the company certainly will be entitled to payment and should clearly have same enforced in some way.

It is alleged by the company that the city absolutely refuses to assist it in making the test and in its having reasonable opportunity, if the plant is not satisfactory, to make it so. It is clearly entitled to this under the contract. Whether by decree for specific performance, as prayed, or by the enforcement of a lien, or by a mere money decree for the balance of the purchase money, may be determined hereafter. It may be proper to consider here the new Equity Rule (Rule 22, 198 Fed. xxiv, 115 C. C. A. xxiv), which is as follows:

"If at any time it appear that a suit commenced in equity should have been brought as an action on the law side of the court, it shall be forthwith transferred to the law side and be there proceeded with, with only such alteration in the pleadings as shall be essential."

If the application of this rule should be necessary, it can be made as the case proceeds.

[3] There is a motion to dismiss on certain parts of the bill, as follows:

"This defendant excepts to the voluminous charges against the mayor of unfairness, newspaper publicity, or prejudice, etc., upon the grounds that

the mayor is not the city nor is the city liable for his statements or his talk or his prejudices or his acts, beyond the scope of his authority, and no authority is shown therefor anywhere in the complaint."

"Therefore this defendant moves to strike the allegations of paragraphs 23, 27, 28, 29, 30, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 59, for the reason that same refer to various positions of the mayor that have no connection with the contract nor with the city, but simply undertake to show that the mayor of the city was personally antagonistic to complainant, abused them in the newspapers, writes about them, etc., with all of which the city of Atlanta is not shown to have anything to do. Certainly they cannot add to nor take from the written contract. This appears from the petition, and all this reference to the mayor is immaterial, irrelevant, and comes under the head of pleadings known as scandalous, and should be stricken. This motion is made also with reference to the following language in paragraph 36, to wit, 'with the deliberate and unfair purpose of injuring the company.'"

I think this motion should be sustained as to paragraph 23. As to paragraph 27, some of it refers to acts of the mayor personally, and some of it refers to acts of the city by name. So much of it as refers to the acts of the mayor should, I think, be stricken, and the same is true of paragraph 28. Paragraph 29 seems to deal, as I gather it, more with the acts of the city than those of the mayor, which is true also of paragraph 30. The only part of 33 which appears to refer to the mayor personally seems to be the last sentence. This, I think, should be stricken. As to paragraphs 34 and 35, I do not think there can be any objection. Commencing with paragraph 37, I think the paragraphs should be stricken down to and including paragraph 59, with the exception of paragraphs 56 and 58, or very largely at least. It is almost impossible to separate those acts which are charged against the city and those which are charged personally against the mayor and are alleged to have been done on account of the mayor's personal feeling of hostility to the company and to the plant. So far as they relate to the acts of the mayor which are claimed to have been done by him by reason of his personal feeling, they could not be charged against the city, unless ratified by the governing body of the city, the mayor, and general counsel. The parenthetical language in paragraph 36, as follows, "with the deliberate and unfair purpose of injuring the company," I think should clearly be stricken.

Summing up, the whole case is this: The Destructor Company contracted with the city of Atlanta to build a plant for the destruction of its refuse. The plant, it is alleged, has been built according to the contract and is now ready to destroy, and is destroying, the refuse of the city as contemplated and as provided for in the contract. The city was to pay the company $260,000 for this plant. It has paid $125,000, and still owes $135,000. The latter amount ($135,000) was to be paid when the plant was completed in accordance with the contract and when the same, after being subjected to the tests provided, is shown to be satisfactory. The company says it has completed the plant and the city refuses to have the test which would show this compliance.

Clearly, if this be true, the company is entitled to relief against the city in some way. Whether this can be shown, if the city denies these allegations, will appear from the proof submitted.

The case of Castle Creek Water Co. v. City of Aspen, 146 Fed. 8,

76 C. C. A. 516, 8 Ann. Cas. 660, is more like the case at bar than any case cited by counsel or of which I have any knowledge, and seems to me an excellent authority for the retention of this case in a court of equity. So I think the peculiar situation and the peculiar facts surrounding the matter make it a case cognizable in equity.

Therefore the motion to strike is overruled, except in the respects mentioned above. The paragraphs and portions of paragraphs which should be stricken can be more readily determined and provided for in an order to be taken denying the motion to strike.