### DESTRUCTOR CO. v. CITY OF ATLANTA.

(District Court, N. D. Georgia. April 20, 1916.)

#### No. 53.

1. MUNICIPAL CORPORATIONS ⬤⟶254—ENFORCEMENT OF CONTRACTS.

According to the allegations of the bill, where a contract for the construction of a refuse-burning plant for a city contained warranties of capacity and performance of the plant, to be determined by tests before payment of a balance due on the contract, also provisions for arbitrators to make such tests in case of disagreement, and the city refused to co-operate in good faith in the making of the tests, but left the contractor in possession, and the latter conducted the plant for a year, consuming all of the city's garbage and other refuse, equity has jurisdiction of a suit by the contractor to enjoin the city from taking possession, to enforce specific performance of the contract, to establish a lien for the balance due, and to obtain a settlement for the service rendered.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 696–700; Dec. Dig. ⬤⟶254.]

2. MUNICIPAL CORPORATIONS ⬤⟶253—CONTRACT FOR CONSTRUCTION OF REFUSE INCINERATOR—CONSTRUCTION AND PERFORMANCE.

A contract for the construction of a refuse-burning plant for a city construed, and the plant as built held, on the evidence, to fully comply with

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the requirements and warranties of the contract, with the exception of a single defective appliance, which could be replaced, and which was not sufficient to justify the city in refusing to accept the plant.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 695; Dec. Dig. ☞253.]

3. MUNICIPAL CORPORATIONS ☞253—PERFORMANCE OF CONTRACT—DAMAGES FOR DELAY IN COMPLETION OF PLANT.

Under a provision of a contract with a city for the building of a refuse-burning plant, that for each day's delay after a specified date in the completion of the plant ready for useful operation the contractor should pay a stated sum as damages, the city is not entitled to recover such damages, where the plant went into use on substantially the date named, and thereafter consumed all the refuse delivered to it, although certain alterations were required, and were thereafter made to make the plant fully comply with all of the warranties in the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 695; Dec. Dig. ☞253.]

4. EQUITY ☞401—SUIT TO ENFORCE CONTRACT—PERFORMANCE—POWER OF COURT TO MAKE TESTS.

Where the question at issue in a suit in equity was as to whether a refuse-burning plant built for a city fulfilled the requirements and warranties of the contract, which by its terms was to be determined by tests, and the contractor alleged that the city refused to co-operate in making such tests, it was within the power of the court to appoint a disinterested commission to make the tests and report the results bearing on all questions in dispute.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 869–873; Dec. Dig. ☞401.]

In Equity. Suit by the Destructor Company against the city of Atlanta. On exceptions to master's report. Exceptions overruled.

The report of the commissioners for making test as to completion of the plant, referred to in the opinion, is as follows:

Pursuant to an order from Judge Wm. T. Newman, of the District Court of the United States, Northern District of Georgia, dated May 14, 1915, for us to make an observation, test, etc., of the refuse destructor supplied by the New York Destructor Company for the city of Atlanta, for the week beginning May 24, 1915, and on one day of that week to make a special 24-hour test of the operation of the destructor when dealing with the refuse mixture as stated in the contract for said destructor, we respectfully beg to inform you that, to the best of our ability, we have endeavored to carry out the instructions of the court.

As our instructions were to make observation for the entire week, you will understand this has involved the collection of a large amount of data, the careful working up of which will require considerable time. Since it seems desirable that you should have in your hands the results of such data, observations, etc., as are pertinent to the issues involved as soon as possible, we beg to inform you that this report is preliminary to our final report, involving the whole week. Said final report will in no wise alter or modify in any way the statements, data, results, etc., as given in this preliminary report. In this report, when we refer to the city of Atlanta, we shall mean those officers, employés, or other persons authorized to speak for or represent the interests of said city. When we speak of the Destructor Company, we shall mean those officers, employés, or other persons authorized to speak for or represent the interests of said Destructor Company.

In order to get an intelligent understanding of the question at issue between

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the city of Atlanta and the Destructor Company, we at first held joint conferences with representatives of the interested parties. We soon discovered that this would not do, as there was an inevitable tendency to "try the case" before us. So we held conferences with each side separately, and later talked freely with representatives of each side, getting in this way as clear an idea as we could of the contentions of each. Some of the questions in dispute are involved in the results of the test of the plant. These contentions will be discussed when we come to speak of the results of said tests. Other contentions relate to subjects which may be discussed from an observation of the plant. We will take up these latter first.

We do not understand that we are to give an opinion as to the wisdom, or otherwise, of the city of Atlanta entering into a contract with the Destructor Company for the construction of the plant. We understand our business to be to help you in an advisory way in deciding as to whether the city of Atlanta should accept the Destructor plant as it stands and pay the balance due the same.

One of the contentions of the city was that the plant could not run a week without breaking down. We beg to advise you that we have found such contention not true. We have been at the plant ourselves, or had trustworthy representatives there, night and day throughout the week specified in the court order, and no breakdown has occurred, and during much of that time the plant was disposing of the city's refuse at a rate far in excess of that specified in the contract.

A specific contention of the city was that the trolley hoists operating the grab buckets which hoist the refuse from the garbage pit and dump it into the furnace hoppers frequently break down, and thus cause delay, trouble, and needless expense. It is needless to state that these hoists operate under very trying conditions. They must be dust and heat proof. If these hoists are not the very best that can be procured, the Destructor Company should be required to furnish them. In our opinion the city should require the Destructor Company to provide for these hoists completely inclosed motors with waste-packed bearings.

Another contention by the city is that the building is not properly ventilated; that, as a consequence, the upper portion, about the charging platform, is very dusty and very hot. It is our opinion that no system of ventilation could remove this dust and take it to the chimney. As to the quantity of dust present, if the entire roof of the building were removed, and every particle allowed to escape freely to the atmosphere, it could not possibly create one-tenth the nuisance that is now created by a plant immediately to the eastward, or by a certain other (manufacturing) plant not far to the westward. Please go and look for yourself. But, in our opinion, if humidifiers were installed in the peak of the roof, they could largely settle the dust that stands there, and thus make it more endurable, or less unendurable, than it now is for the men who operate the charging hoppers.

As to the heat, great heat cannot help being hot. The contract calls for the liberation and bringing into evidence about 1,850,000,000 British units of heat every 24 hours, and the generation of over 750,000 pounds of high pressure steam. In the nature of things the place is bound to be hot.

Another contention of the city is that the furnaces have been changed since they were originally constructed, and that they now contain features not embraced in the contract, and that, therefore, the city is not getting what it contracted for. The contract explicitly states that the builders shall have the right to make such changes as they shall find necessary to the successful working of the plant. We are unable to see that the city has just ground for complaint in this respect.

Specifically, complaint is made that air is admitted at the sides of the cooling chambers, as well as through the grate on which the clinker rests while being cooled, instead of solely through the bottom grate, as originally constructed, and that this change has rendered the furnaces less efficient as a refuse destructor. As we have been able to observe the plant only as it now is, we cannot give positive evidence on this point. The presumption would be,

however, that since this plant has not yet been accepted by the city, and the Destructor Company is trying to get the city to accept it, self-interest would prevent the city's claims.

The question has been raised as to when the plant was completed. This, perhaps, admits of argument. It might be claimed that it was completed when it began to consume, to destroy, the city's refuse; or it might be claimed that the plant was completed when all changes and additions had been made, substantially as it presented itself to us on May 24, 1915. Mechanically, of course, this would be true; but there are also ethical and legal questions involved. We may presume to discuss the ethics of the case. Suppose the litigation should go on and on, with no decision, until, in the very necessities of the case, the plant were worn out. On that basis it never would have been completed. This would obviously be grossly unfair to the Destructor Company. In our opinion the Destructor Company should be credited with having completed the plant mechanically on that date, which the records can show, when it stood structurally and mechanically as it did May 24, 1915, at which time a test would, in our opinion, have shown the same results as that held May 26, 1915.

A reasonable cost of supervision should be allowed the Destructor Company from such date as the plant could have been accepted by the city up to the time the city assumes operation of same; this over and above the 25 cents per ton labor charge. The Destructor Company state that they were ready for a test in December, 1913, and called on the city for a test at that time, which the city refused to give. The Destructor Company claim that, therefore, the plant was completed at that time. We respectfully submit this nice point in morals to you to decide. It is not a mechanical question. It is a question of law and ethics. Perhaps a decision which would leave both parties dissatisfied would be most nearly equitable.

It is contended by the city that the rate of combustion on the grates, as specified in the bid, 115 pounds of refuse burned per square foot of grate per hour, is too high a rate for a reasonable life to the grates. This is equivalent to the liberation of about 425,000 British thermal units per hour per square foot of grate. In steam boilers fired with coal this would be equivalent to about 30 pounds of coal per hour per square foot of grate. While such a rate for coal is high, it is by no means excessive. But the burning of coal is a very different operation from the burning of refuse. The burning of refuse, in so far as character of the combustion and the manner of the liberation of heat are concerned, is almost identical with the burning of bagasse. As to the burning of bagasse, see Louisiana Bulletin No. 117, Louisiana State University Agricultural Experiment Station, by Prof. E. W. Kerr. As the result of numerous experiments of burning bagasse, Prof. Kerr places the lowest economical limit at 100 pounds per square foot of grate per hour. He gives experiments as high as 197 pounds per square foot of grate per hour, with no adverse comment. This latter would represent a liberation of heat at a rate of over 700,000 units of heat per hour per square foot of grate.

The Babcock & Wilcox Company, who have supplied a very large number of boilers to sugar mills, and hence have had wide experience in the burning of bagasse, state that a rate of burning of 300 pounds bagasse per hour per square foot of grate is, in their experience, the most economical, although they state that a rate of 450 pounds can easily be obtained. The 300-pound rate, at 4,000 British thermal units per pound, calls for a liberation of heat at the rate of 1,200,000 British units per hour per square foot of grate. The 450-pound rate calls for 1,800,000 British thermal units per hour, per square foot of grate. This latter rate is more than four times the rate specified in the contract.

Bagasse and refuse are similar as to physical and chemical properties, and both are very unlike coal. Both are high in water content, low in fixed carbon, and high in volatile matter. A study of the literature on the burning of bagasse is conclusive as to the prodigious rate at which fuels of the character of bagasse and refuse can be economically made to liberate heat for

the generation of steam in boilers. As you are perhaps aware, very little fuel save bagasse is used about a sugar mill for the generation of the large quantity of steam required in the manufacture of sugar.

As we see it, the only difference between the burning of bagasse and the burning of city refuse, is in the residue—the ash, the clinkers. The ash in bagasse is small. In refuse it is large. We went inside the furnaces and combustion chambers on Sunday, May 30th, after the week of our observation of the working of the plant, and carefully inspected them. The combustion chambers become thickly coated with the residue, a foot thick on the sides, and thicker in the bottom. If the temperature were carried too high, say as high as 2,000° F., this would form a glazed mass so hard it would have to be removed with chisels and drills. If the temperature is not carried so high, the deposit is less dense, and can be removed with picks. This deposit has to be removed every Sunday, or the chambers would choke. The density of the deposit is entirely within the control of the furnace operator. He controls it by admitting more or less air, as the case requires. It is necessary to have this deposit as a protection to the furnace lining. In short, we do not find that the city's contention is sustained.

We have thought best not to burden you with any fine-spun theoretical discussion on combustion, as likely you have an ample supply to draw on in the testimony you have had submitted to you. We have preferred to present to you the simple, practical conditions as we see them. As to the condition of the residue, the clinker, as it is withdrawn from the cooling chambers, we had a man whose sole duty it was to carefully inspect the residue throughout the week of our observations on the plant. We have had many interviews with that man, and have gone over carefully the notes he took during the week, and give you the summary of those observations. We will give only one day, that of Friday, following the test. This was by far the worst day for unconsumed organic matter, as revealed by his observation. He states that the total quantity of unconsumed organic matter he observed on that day was about 30 pounds. It consisted of potatoes, tomatoes, potato peelings, a bunch of feathers, a chicken carcass, and kitchen refuse. How these objects could pass through that inferno of heat we do not attempt to explain. They did. On that day the destructor burned about 300 tons of refuse. Thirty pounds is about .005 of 1 per cent. of the refuse burned, or say .025 of 1 per cent. of the clinker.

The city contends that this clinker is not a good road-making material. How does the city know? Where has the city attempted to make a road of it? We know of no such effort. On Sunday, May 30th, we walked over Emett, Vine, and several other streets in that section of the city, where the clinker had been deposited in the streets; but we saw no place where any effort whatever had been made to make a road of it, much less a street. The clinker had apparently been left just as it was dumped from the carts. To our personal knowledge, clinker is a first-class road-making material. To our personal knowledge, the finest road in a certain county in New York state, where so many millions have been spent for good roads, was, two years ago, a clinker road, and nothing else. It would be a simple matter to rake the sheet metal and wire off the broken clinker, and it seems unfair that no attempt has been made to construct a road from this material.

The foregoing are the principal contentions that have been presented to us; but, after careful investigation, we find that they are not supported by the facts.

We now come to the results of the test. In order to obtain the refuse mixture called for in the contract, viz., 45 per cent. garbage, 15 per cent. ashes, 5 per cent. manure, and 35 per cent. rubbish, it was necessary for Chief John Jentzen, of the sanitary department, to save up the garbage for several days prior to the test, and even then he was not able to secure enough to run a 24-hour test, as called for in the contract. The weather was dry and hot, and, when the test began, Wednesday at 1 p. m., May 26th, the garbage heap, about 90 tons, had become a reeking, seething mass of literally tons of maggots. Whether the calorific value of this garbage, in such a condition, had

been increased or diminished, we do not know. It is certain that a good deal of water had drained out of it.

Date of test, May 26–27, 1915.

Test began at 1 p. m., May 26, and closed at 6:10 a. m., May 27, 1915.

### Total Quantities.

| | | |
|---|---|---|
| 1. | Refuse fed into furnaces, pounds | 391,085 |
| | (Of proportions specified in the contract.) | |
| 2. | Dry clinker withdrawn, pounds | 112,300 |
| 3. | Per cent. of water in clinker | 13.45% |
| 4. | Clinker, per cent of refuse | 28.80% |
| 5. | Refuse, less clinker, pounds | 278,785 |
| 6. | Water evaporated, pounds | 530,258 |
| 7. | Furnace hours | 51.5 |
| 8. | Duration of run | 17 hr. 10 min. |

### Average Quantities.

| | | |
|---|---|---|
| 9. | Steam pressure, pounds per square inch, abs | 190.05 |
| 10. | Steam temperature, degrees F. | 515.22 |
| 11. | Superheat, degrees F. | 137.62 |
| 12. | Feed water, before passing through feed water heater | 78° F. |
| 13. | Feed water, after passing through feed water heater | 190.31° F. |

### Factors of Evaporation.

| | | |
|---|---|---|
| 14. | Boiler only | 1.0706 |
| 15. | Boiler and superheater | 1.1508 |
| 16. | Boiler and feed water heater | 1.186 |
| 17. | Boiler, superheater, and feed water heater | 1.266 |

### Rates.

| | | |
|---|---|---|
| 18. | Pounds of water evaporated per pound material fired | 1.3558 |
| | Equivalent evaporation, from and at 212° F. per pound of material (refuse) fed into furnaces. | |
| 19. | Boiler only, pounds | 1.4509 |
| 20. | Boiler and superheater, pounds | 1.5594 |
| 21. | Boiler and feed water heater, pounds | 1.6082 |
| 22. | Boiler, superheater, and feed water heater, pounds | 1.7167 |
| 23. | Pounds water evaporated per pound refuse fed to furnaces, less clinker, observed | 1.905 |
| | Equivalent evaporation from and at 212° F. per pound of refuse fired, less clinker. | |
| 24. | Boiler only, pounds | 2.038 |
| 25. | Boiler and superheater, pounds | 2.190 |
| 26. | Boiler and feed water heater, pounds | 2.26 |
| 27. | Boiler, superheater, and feed water heater | 2.41 |

### Capacity per 24 Hours.

| | | |
|---|---|---|
| 28. | Based on 72 furnace hours, tons | 273.5 |
| 29. | Average temperature of charging floor | 121.5° F. |
| 30. | "            "         out doors | 75.7° F. |
| 31. | "     difference | 45.8° F. |

The contract calls for the plant to "be capable of destroying in normal operation 250 tons of refuse per 24 hours." The test gave a rate of 273.5. The contract rate is thus exceeded by about 9.4 per cent. If the Destructor Company had chosen to do so, they could have burned up all the refuse over an hour before they did, thus raising its capacity, on the specified mixture, to about 293 tons per 24 hours. They delayed the rate of combustion in order to raise the rate of evaporation. They consulted us as to whether they would be permitted to do this and we consented to it. This was at about 4 a. m.

There has been a great deal of contention over the feed water heater. The contract states that "the rate of evaporation in the boilers, from and at 212° F. per pound of refuse consumed, shall not be less than 1.96 pounds." By ref-

erence to line 25 in results of test, it will be seen that the rate of evaporation in the boilers, including the superheater (about which latter there has been no contention), per pound of refuse fed into the furnace, less the clinker, is 2.19 pounds, thus exceeding the contract guaranty. See note at close of report.

This interpretation of the wording of the guaranty thus eliminates all contention as to whether the heat of the feed water heater should or should not be credited to the boiler. We do not admit that the heat of a feed water heater should be credited to the evaporative performance of a boiler. The performance of a boiler, its evaporating ability should be reckoned on the boiler only. The contract states that the temperature of the combustion chambers must not drop below 1,250° F. At no time during any of the runs did we observe its temperature as low as this. During the special mixture test the average temperature was 1,615° F. As previously stated, the temperature of these chambers is within the control of the furnace operatives.

If the refuse be credited with an available heat value of 3,700 British Thermal Units per pound, the efficiency of the boiler alone, with steam at 190.05 pounds, abs., feed water at 190.3°, and an evaporation of 1.3558 pounds water per pound of refuse fired, efficiency of boiler equal 38 per cent. Including the superheater, efficiency of boiler and superheater equals 40.6 per cent. Now the efficiency of these boilers is a good deal higher than above figures. The conclusion is, therefore, inevitable that the available heat value of one pound of the refuse fired during the test is much below 3,700 British Thermal Units. This accounts for the comparatively low evaporation per pound of refuse fired.

The question has been asked us apparently in good faith, as to whether the steam now flowing to waste into the atmosphere has any commercial value. That seems to us an odd question. If we allow that the plant auxiliaries use 15 per cent. of the steam generated (which is too high an allowance if the steam were properly utilized by the city), there flowed to waste in the atmosphere, during the 17.16 hours of the special mixture test, 450,000 pounds of high pressure highly superheated steam which, at a valuation of 3 cents per 100 pounds, was worth $135. This corresponds also to a valuation rate for electric current of one-half a cent per kilowatt hour. Counting 300 days to the year, this amounts to $40,000 per year, absolutely thrown away. With the plant working 24 hours per day at contract capacity, it amounts to $52,000 per year.

We are not aware that our duties call upon us to make any suggestions as to the use which could be commercially made of this steam. We may state, however, that we know of no adequate reason why the citizens of Atlanta should not receive the money value of this steam now flowing to waste. There are ways of accomplishing this without doing injustice to men who have invested their money in the public utilities and industrial enterprises of the city. If such ways cannot be found, then we say: Let it flow to waste.

Finally, we do not know, we have been unable to discover, no adequate reasons have, in our judgment, been presented to us, why the city of Atlanta should not accept the destructor plant on such equitable legal and ethical basis of settlement as you shall determine. In making this statement at least two of us are aware that we are going counter to the wishes of very dear friends, men whom we have loved and respected, and whose friendship we have highly valued for a quarter of a century.

In closing, we beg to extend to the chief, John Jentzen, and his staff, of the sanitary department, to the officials and employés of the New York Destructor Company, to the officials of the city of Atlanta, and to Prof. E. T. McCarthy and his corps of students from Georgia Tech., and Mr. Rapp, of the water department, our sincere thanks for their hearty co-operation and invaluable assistance throughout the work of our observations and test.

### Supplement.

In deciding upon the rate of evaporation with which the boilers should be credited, we have construed the words "refuse consumed" to mean refuse fed into the furnaces, less clinker taken out. The contract explicitly states that all clinker and refuse shall be weighed. There cannot be any possible object in weighing the clinker and refuse, unless this interpretation be accepted. In no other place in the contract is the word "consumed" used.

We protest against the wording of the contract in this manner. It is unscientific, inexact, and leaves a chance for differences of opinion, where none should exist. It is not in accordance with standard engineering practice.

Frazer & Spier, of New York City, and Evins, Spence & Moore, of Atlanta, Ga., for plaintiff.

James L. Mayson, City Atty., and W. D. Ellis, Jr., Asst. City Atty., both of Atlanta, Ga., for defendant.

NEWMAN, District Judge. On August 19, 1914, the Destructor Company filed its bill in equity against the city of Atlanta. The allegations of the bill are shown substantially in the opinion filed by this court on October 15, 1914, which appears in 219 Fed. 996. The substance of the bill was: That, on July 9, 1913, the Destructor Company made a contract with the city of Atlanta for the erection by the company of a plant for the destruction of the city's refuse. That about a year before this contract was made the company had made a previous contract with the city providing for the erection by the company of substantially the same plant and an electric generating plant for the utilization of the steam produced. That this contract had been made with a previous city administration, and had been based upon a practice which had been current in the city of Atlanta for many years, under which one city administration, in making contracts for important public works, pledged the moral obligation of the city to fulfill them in part during the succeeding administrations. That a suit was instituted against the city and the Destructor Company, in the superior court of Fulton county, to have this contract declared illegal and invalid. That the superior court held the contract to be legal, and the case was taken to the Supreme Court of the state, which reversed the decision of the lower court, and declared the contract illegal, as being beyond the power of the city government. When this decision was announced, the Destructor Company had done a large part of the work of erecting the plant under the first contract, and on the city's land, relying in good faith on the advice of counsel of both the city and the company that the contract was legal and that the city would fulfill the moral obligation to perform it, and had expended large sums in such performance, but had received no payments from the city. That in this situation the present contract was made. It differed from the previous contract mainly in cutting out the electric generating plant, and thus making no provision for the utilization of the surplus steam produced in the operation of the plant, reducing the contract price, which was $274,759, plus about $8,000 for extras allowed for excavation and foundation, by over $22,000, to the sum of $260,000, and providing that this reduced price be paid, $125,000 cash upon the execution of the new contract, and the balance of $135,000 when the plant was completed and proved by tests as prescribed in the specifications to meet all requirements. That the $125,000 was paid by the city to the company under the present contract. That upon signing the contract the company entered upon the work of completing the plant, and in accordance with the terms of the contract it was completed and ready for useful operation by August 15, 1913, and the company notified the city that the plant was ready. That the city, a few days later, began regular delivery of refuse at the plant, and the company has been

operating the plant ever since, and has kept it in continuous operation, and destroyed all of the city's refuse that has been brought to the plant, with a few unimportant exceptions.

It is alleged that the contract contains certain guaranties of performance in the matter of capacity, steam production, etc., and provides that the fulfillment of these guaranties shall be determined by tests of 24 hours' duration, with a refuse mixture of certain specified proportions. The contract provides that the first test shall be made at a time fixed by the company, and the second at a time to be agreed upon between the city and the company, within six months after the plant was ready for useful operation. Reference is then made to certain clauses of the contract, which relate to the right of the company to make changes in the incinerator if by doing so it may be made to satisfactorily fulfill the requirements of the guaranty, and with reference to the character of the work that it must be done to the satisfaction of the city, and it is then alleged that the company, on finding the actual conditions were different from those represented by the city and specified in the contract, and to meet which the plant had been designed, did not lie back and claim that it was only required to burn refuse in the proportions specified, but that it, in substance, did try to meet actual conditions.

It is alleged that at the time the bill was filed it had fulfilled its contract, and that on August 8, 1914, the plant had fulfilled all guaranties and requirements of the contract, but the city still refused to pay the balance due. Certain applications for tests made by the company to the city are then referred to, and after certain failures to have a test it is alleged: That on March 14, 1914, a test was run. That on this test the crematory satisfactorily destroyed all the refuse, but fell 10 per cent. short in the amount destroyed in 24 hours; that is, the contract provided for the destruction of 250 tons in 24 hours, and the plant destroyed 225 tons. That the company then, as allowed by the contract, made certain changes to meet the full requirements of the contract, although it had great difficulty in making such changes and keeping the plant in operation. Reference is then made to a test attempted to be made on August 8, 1914, as to which, while the refuse furnished was not what it should have been, the report of Gabriel R. Solomon, an unbiased engineer who ran the test, showed compliance with all guaranties and requirements of the contract.

In an amendment to this bill it is alleged that on the date the bill was filed the company had fulfilled its contract with the city of Atlanta and that on the test of the crematory plant held on August 8, 1914, the plant complied with the guaranties and requirements of the contract. The substance of the allegation is that, while on March 14, 1914, the plant lacked 10 per cent. of destroying the amount of refuse required by the contract, the changes thereafter made brought the plant up to the required capacity. It is then alleged that, the plant having been completed in accordance with the contract, the company asks for a test.

The prayers of the bill are for an injunction restraining the city from taking possession of the plant until they have paid the amount due under the contract; for a receiver to take charge of the plant, and op-

erate it; that the receiver be instructed to afford the company every reasonable opportunity to install at its own expense such improvements as it may deem necessary to increase the efficiency of the plant; that the plaintiff's interest in or lien upon the plant be declared, protected, and enforced by foreclosure of the lien or otherwise; that the court may determine the amount due the plaintiff for building the plant, and decide by running a test whether plaintiff has complied with its contract, and, if not, give it reasonable opportunity to make such improvements and run such further tests as shall show that the plant complies with all the guaranties of the contract and that the contract be specifically enforced in this respect; that the provisions of the contract for the settlement of all disputes by arbitration be enforced by the running of a fair test by arbitrators under the court's supervision; that an accounting be had as to the amount due the company from the city for the building and operation of the plant and the extra expenditures caused the company, for which the city is responsible; that the final amount due from the city having been determined, and the amount realized by the foreclosure of the company's lien having been applied thereon, a judgment for the deficiency be given against the city.

In the opinion referred to, passing upon a motion to dismiss the bill, this is stated:

"Summing up, the whole case is this: The Destructor Company contracted with the city of Atlanta to build a plant for the destruction of its refuse. The plant, it is alleged, has been built according to the contract, and is now ready to destroy, and is destroying, the refuse of the city, as contemplated and as provided for in the contract. The city was to pay the company $260,000 for this plant. It has paid $125,000, and still owes $135,000. The latter amount ($135,000) was to be paid when the plant was completed in accordance with the contract, and the same, after being subjected to the tests provided, is shown to be satisfactory. The company says it has completed the plant and the city refuses to have the test which would show this compliance. Clearly, if this be true, the company is entitled to relief against the city in some way. Whether this can be shown, if the city denies these allegations, will appear from the proof submitted. The case of Castle Creek Water Co. v. City of Aspen, 146 Fed. 8, 76 C. C. A. 516, 8 Ann. Cas. 660, is more like the case at bar than any case cited by counsel, or of which I have any knowledge, and seems to me an excellent authority for the retention of this case in a court of equity. So I think the peculiar situation and the peculiar facts surrounding the matter make it a case cognizable in equity."

The motion to strike is then overruled, except that there were certain paragraphs in the bill, and certain parts of paragraphs relating to the action of the mayor, and as to these the court sustained the motion to strike. In reference to this ruling, this was said in the opinion:

"It is almost impossible to separate those acts which are charged against the city and those which are charged personally against the mayor and are alleged to have been done on account of the mayor's personal feeling of hostility to the company and to the plant. So far as they relate to the acts of the mayor, which are claimed to have been done by him by reason of his personal feeling, they could not be charged against the city, unless ratified by the governing body of the city, the mayor and general council."

After the court had passed on the motion to strike, certain language of the bill was stricken by an amendment offered by the plaintiff, and the amendment was allowed by the court. An answer was

then filed by the city, and the case was referred for hearing and report to the standing master of the court. Before the reference of the case, and in a few instances after the reference, it was brought to the attention of the court as to matters which it will not be necessary to mention now. The master had numerous hearings, running through several months, and the testimony taken, which was voluminous, was filed with his report on September 4, 1915. The master's report was in favor of the plaintiff, the Destructor Company, and to this report numerous exceptions were filed by the city. It is on these exceptions that the present hearing was had, and whether or not these exceptions, of any of them, should be sustained, is the matter which, after lengthy argument and very complete and ably prepared briefs by counsel for both sides, must now be determined.

[1] The first question for determination is whether it is a case cognizable in equity. I determined this question on the motion to dismiss in favor of the right to maintain the bill, and subsequent developments have strengthened my belief that it is a case which could only be disposed of properly in a court of equity. In the first place there are 3,882 pages of the testimony offered at the hearing, and in the second place the objections made to the plant and the reasons given why it does not come up to the contract are many, and the questions all of such character that it would be impossible to dispose of them satisfactorily in a trial at law before a jury. Besides this, it is a bill in which application was made for a receiver, and in which an injunction was prayed and granted. There was also an application for a test in accordance with the contract, which it is alleged the city refused, and as to which there was a prayer that the court should provide such a test; also there was a prayer for an accounting as to what expense the plaintiff had been put to in operating the plant after it was ready for use.

Section 267 of the Judicial Code, formerly Section 723 of the Revised Statutes of the United States (Comp. St. 1913, § 1244), is as follows:

"Suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law."

In Simkins' A Federal Equity Suit, in discussing this section, he says:

"First. It is not enough that there be a remedy at law, but it must, in the discretion of the chancellor, be as plain, practical, efficient, and speedy as the remedy in equity, in order to decline jurisdiction in equity."

The author then cites, among a number of other cases, Tyler v. Savage, 143 U. S. 95, 12 Sup. Ct. 345, 36 L. Ed. 82, and in the opinion in that case there is this paragraph:

"Under section 723 of the Revised Statutes, the remedy at law, in order to exclude equity, must be as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity [citing authorities]."

Mr. Simkins proceeds:

"Second. That the legal remedy, both in respect to the final relief and the mode of obtaining it, must be as efficient in law as in equity [citing, among a

number of others, the case of Walla Walla v. Walla Walla Water Co., 172 U. S. 12, 19 Sup. Ct. 82, 43 L. Ed. 341]."

In the opinion in that case this is said:

"This court has repeatedly declared in affirmance of the generally accepted proposition that the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity [citing the authorities]."

Tested by the rule thus laid down, there can be no question, I think, that this is a case cognizable in equity.

[2] There is a provision in the contract as follows:

"All work under this contract shall be done to the satisfaction of the city of Atlanta, or its representatives, who shall determine all questions as to the meaning of the specifications, or the fitness, of any work or material, and their decision shall be final, except in the event of a dispute arising between the contractor and the city of Atlanta regarding the execution of this contract, or for the acceptance of the plant. They shall each appoint a representative, and these two shall appoint a third. These three representatives shall make a thorough investigation sufficient to determine the question in doubt, and their decision shall be final. The expense of these representatives shall be paid jointly by the contractor and the city, each party one-half."

It is alleged in the bill that the city had refused, when the plant was finally completed, to appoint a representative to act with the representative appointed by the Destructor Company, in accordance with this provision of the contract, and a prayer of the original bill was:

"That, if necessary, the provision of the contract for the settlement of all disputes by arbitration be specifically enforced by the running of a fair test by arbitrators under the court's supervision, so that the court may accept as final an award by arbitrators after a test so run."

Application was made to the court for the appointment of three gentlemen to run this test during the hearing before the master, and the court appointed three gentlemen, Dr. J. S. Coon, Professor of Mechanical Engineering at the Georgia School of Technology, Atlanta, Ga., Mr. J. E. Sirrine, of Greenville, S. C., an expert in machinery, and Mr. J. K. Orr, a manufacturer and wholesale merchant of Atlanta, as the arbitrators. The order provided for these gentlemen to observe the operation of the plant for one week and to make a special test on one day, for which preparation should be made. These three gentlemen accepted the duty imposed upon them by the court, and the test was run as directed. The report of these gentlemen was made to the master and submitted by him with his report, and has since been verified and entered as a part of the record in the case.

In the master's report, after referring to the previous contract between the parties and this contract, he states:

"On signing the present contract the company entered upon the work of completing the plant in accordance with it. In August, 1913, the month after the contract was signed, the structure of the plant and the furnaces and operating equipment were finished, and the furnaces dried out and ready for useful operation. The construction work of the plant, including the chimney, is admitted by every one to be very fine. Accordingly, on August 15, 1913, the date provided in the contract for putting the plant into useful operation, the company sent written notice to the city, addressed to the board of health, that the plant was so completed and ready for useful operation. The board of health is composed of the mayor of the city, the chairman of the sanitary

committee of the general council, and ten other members elected by the general council, one from each ward, and, under the city charter, has supervision over the sanitary department of the city and appoints the chief of the sanitary department. It is the sanitary department that collects the city's refuse. The contract between the parties, in sections 1, 12, and 18, recognizes the board of health as the authorized agency of the city government under the contract.

"The board of health, on August 15, 1913, the date of receiving notice from the company that the plant was ready for useful operation, answered, acknowledging receipt of such notice from the company, and stated that the delivery of city refuse at the plant would be begun on the succeeding Monday, August 18, 1913. In this letter of August 15, 1913, the clerk of the board of health stated: 'I am further directed to state that the board will pay for all garbage burned in the plant at the rate of 25 cents per ton, with the understanding that this amount shall be payment in full for all expenses connected with burning same, labor, fuel, or other expense of whatever nature.' The company did not reply to this letter, so far as the evidence discloses."

Referring to the company's operation of the plant and the tonnage burned, the master reports as follows:

"The city began about Monday, August 18, 1913, regularly delivering the city's refuse at the plant, and has continued to do so ever since; that is to say, for over 20 months. (The only exceptions are two half days, September 15 and October 11, 1913, on each of which two days the plant was partially shut down for half a day because of accidents to the electric machinery, and on these two half-days the city dumped its refuse elsewhere instead of delivering it at the plant.) With the exception of these two half weekdays and some Sundays, the company has kept the plant in continuous operation for more than 20 months, and has destroyed all of the city's refuse which has been brought to the plant during that time. This finding does not mean to say that every bit brought to the plant in a day has been destroyed within the 24 hours after it was brought. Very often that was not the case, but the refuse would accumulate at times until it was piled quite high in the pit, and a few times it had to be placed on the outside temporarily. However, in the long run, all of the refuse has been destroyed. The following figures give a good idea of the practical accomplishment of the plant over a period of over a year and a half in the matter of disposing of the city's refuse:

"In the 20 complete months that the plant has been in operation (September 1, 1913, to April 30, 1915, inclusive) the city has delivered and the plant has burned 112,798 tons of refuse. In that period there have been 519 weekdays and 85 Sundays. In the ordinary operation of the plant it is necessary to shut down the furnaces, let them cool off, and clean them out about once a week. Usually this cleaning is to be done on Sundays, but on some Sundays, when there has been an accumulation of refuse in the previous week, or the previous Saturday, the plant has burned refuse on Sundays. Thus the plant burned on 21.02 of the 85 Sundays in this 20 months period. On the other hand, the furnaces have sometimes been shut down on weekdays, instead of on Sundays, to be cleaned out, as well as because of breaks, especially in the transporting machinery. Thus the furnaces have been shut down for cleaning out only on 21.58 weekdays in this 20-months period. The time in which the plant was burning refuse on Sundays has thus almost exactly balanced the time when the furnaces have been shut down on weekdays to clean out; and in this 20-months period, containing 519 weekdays, the plant has burned refuse for 518.44 days, which, for convenience, I call 'burning days.' The 112,798 tons burned during this 20-months period (containing 518.44 burning days) averages 217 tons per burning day, and the same per weekday. As the city had entire control over the delivery of refuse at the plant, the amount of refuse burned has necessarily been dependent upon the amount the city has delivered. On many burning days the company has cleaned up the refuse on hand considerably before the end of the day, and it has had to lie practically idle until the next day's deliveries of refuse began. At other times it has not burned all that was delivered, and it has accumulated. In months when the city's delivery of refuse at the plant was greater, the average amount burned per burning day for the month was greater. Thus the average number of

tons burned per burning day in December, 1913, was 231 tons a day. In July, 1914, it was 239 tons a day. In August, 1914, it was 243 tons a day, besides coal and wood used, and in January, 1915, it was 245 tons a day. On a large number of days the plant has considerably exceeded the rate of 250 tons a day, and burned at as high a rate as 290 tons on December 30, 1913, 281 tons on April 6, 1914, 306 tons on April 21, 1914, 285 tons on July 15, 1914, and 293 tons on October 2, 1914, besides more than 270 tons on a good many other days. The 'log' of the plant's operation, which was submitted on the trial and proved by evidence, is as follows:

Log of Atlanta Destructor Showing Plant Performance, August, 1913, to April, 1915.

| Month. | Tons Delivered and Burned. | Weekdays. | Sundays. | Sundays Burned. | Weekdays Shut Down for Cleaning Only. | Burning Days. | Tons per Burning Day. | Remarks. |
|---|---|---|---|---|---|---|---|---|
| **1913** | | | | | | | | |
| Aug. | 2110 | | | | | | | |
| Sept. | 5054.7 | 26 | 4 | .35 | | 26.35 | 215 | |
| Oct. | 4977.3 | 27 | 4 | 1.50 | | 28.50 | 175 | Trouble with clinker and dirt stopping air supply. |
| Nov. | 5133.0 | 25 | 5 | 2.02 | 2.02 | 25.00 | 205 | Trouble with clinker and dirt stopping air supply. |
| Dec. | 6210.2 | 26 | 4 | 1.71 | .79 | 26.92 | 231 | Overheating of grates. |
| **1914** | | | | | | | | |
| Jan. | 6227.0 | 27 | 4 | 1.83 | 1.02 | 27.81 | 223 | "   "   " |
| Feb. | 5360.8 | 24 | 4 | 1.03 | .82 | 24.21 | 221 | Changing grates. |
| Mar. | 5739.4 | 26 | 4 | 2.35 | .35 | 28.00 | 205 | "   " |
| Apr. | 5712.2 | 26 | 4 | 1.00 | | 27.00 | 212 | Ordered shut down Sundays, April to July. |
| May | 5217.2 | 26 | 5 | | 1.90 | 24.10 | 217 | Ordered shut down Sundays, April to July. |
| June | 5294.7 | 26 | 4 | | 1.22 | 24.78 | 218 | Using extra ash and coal makes daily tonnage 245. |
| July | 6964.4 | 27 | 4 | 2.45 | .23 | 29.22 | 239 | One weekday out cleaning for test. |
| Aug. | 6105.6 | 25 | 5 | 1.83 | 1.68 | 25.15 | 243 | |
| Sept. | 5466 | 26 | 4 | .31 | 1.17 | 25.14 | 217 | |
| Oct. | 5733.5 | 27 | 4 | .58 | 1.18 | 26.40 | 217 | Induced draft fan put in. |
| Nov. | 5389.7 | 25 | 5 | .90 | 1.35 | 24.55 | 219 | |
| Dec. | 5696.3 | 27 | 4 | .54 | 1.69 | 25.85 | 220 | |
| **1915** | | | | | | | | |
| Jan. | 6440.6 | 26 | 5 | 1.52 | 1.22 | 26.30 | 245 | |
| Feb. | 5009.4 | 24 | 4 | .56 | 1.06 | 23.10 | 220 | |
| Mar. | 5481.3 | 27 | 4 | .86 | .99 | 26.87 | 204 | |
| Apr. | 4994.7 | 26 | 4 | .08 | 2.89 | 23.19 | 216 | |
| | 112798.0 | 519 | 85 | 21.02 | 21.58 | 518.44 | | |

Average number of tons destroyed per month......................... 5639.9
Average number of tons destroyed per burning day.................... 217.6

All material delivered was destroyed. As fires were often banked, if more material had been delivered, more would have been destroyed.

Adding extra fuel burned in July and August, and water used to wet dry refuse in December, January, and February, makes daily tonnage destroyed during those months 246 tons.

Altogether this shows what the plant was able to do between the dates mentioned, August, 1913, to April, 1915.

The master then proceeds with what he calls the "Contract Guaranties, Allowance for Wear and Tear, Provisions for Tests and Changes," and a part of his report is as follows:

"The contract contains certain guaranties of performance in the matter of capacity, steam production, etc., and provides that the fulfillment of these guaranties shall be determined by tests of 24 hours' duration, with a refuse mixture of certain specified proportions. The exact wording of these guaranties is given below in the findings discussing the plant's fulfillment of them on the test held August 8, 1914. The contract also provides that allowance shall be made for ordinary wear and tear in determining the fulfillment of the guaranties. The language to this effect, immediately following the guaranties, says: 'It is understood, however, that in operating said plant to conform to the operating conditions above set forth, and also as provided in the city's specifications, allowance shall be made for ordinary wear and tear.'"

The first question in the case, and one of the most important questions, is whether or not this plant will destroy the quantity of refuse named in the contract. This was to be ascertained by tests, as has been stated. The provision of the contract with reference to tests is this:

"Sec. 9. Two tests to determine the capacity and other guaranties made by the contractor will be made as follows: The first test shall be made at such time as the contractor states that he is ready, but it shall not be made until sufficient time has been given to thoroughly dry out the furnaces to prevent any cracks in the brickwork. The second test to be made at a time mutually agreed upon between the city and the contractor within six months after the plant has been put in useful operation. The contractor shall supply the workmen for these tests, and the city shall pay the contractor therefor at the rates of wages hereinbefore prescribed. The contractor shall have control of the operation of the plant during the tests, but representatives of the city shall be permitted to be present throughout. Each test shall last at least 24 hours, with a running start. All refuse and residual shall be weighed. All water shall be measured by meter or tanks, and the necessary temperature to be taken with electric pyrometers. If in the tests the plant does not come up to requirements, or does not fulfill each and every one of the guaranties and specifications, the city may refuse to accept the plant. However, every reasonable opportunity shall be given the contractor to make changes in the incinerator, if by so doing it may be made to satisfactorily fulfill the requirements and guaranties. The contractor shall make these changes at his expense, in a thoroughly workmanlike manner, and shall then conduct further tests as is described above, but at his own expense, to demonstrate to the city or its representatives that the changes made have sufficiently raised the efficiency of the plant. But such demonstration shall not debar either the contractor or the city from demanding a test conducted by three representatives and paid for as specified in section 2 of the agreement."

Section 2, here referred to, is the provision for an arbitration, if there was a difference between the parties as to whether the plant came up to the guaranties of the contract, and has already been referred to.

The specifications prepared by the board of health of the city con--

tain a clause with reference to the composition of the refuse to be destroyed, which was as follows:

"Sec. 5. Refuse consists of garbage, rubbish, ashes, etc., as collected from domestic dwellings, stores, schoolhouses, churches, hotels, stables, etc., and is represented by the city to consist of approximately the following proportions, on which proportions the tests and guaranties hereinafter provided for shall be based:

Garbage ............................................ 45 per cent.
Stable manure ...................................... 5 per cent.
Ashes .............................................. 15 per cent.
Rubbish ............................................ 35 per cent."

The master then says:

"These proportions, so represented, are about the average for the year in Atlanta, and a plant designed to dispose of refuse of these approximate proportions would be best suited for disposing of Atlanta's refuse and thoroughly practical. The company's representative, Mr. Dowd, came to Atlanta previous to the letting of the contract and visited the various dumps in the city, as well as the old crematory, where a portion of the refuse of the city was burned, and had that opportunity to see what the composition of the refuse was in Atlanta. It is in evidence, further, that he made suggestions to the board of health while they were preparing the specifications, and did furnish them with certain suggestions in written form, notably as to the composition of the refuse. The testimony shows that in engineering practice guaranties of the precise performance of a plant or engine necessarily have to be based on a fuel distinctly specified as a standard, and that, as the fuel used varies from the specified standard, so will the performance of the plant, or engine, vary somewhat from the performance guarantied on the fuel specified as the standard."

In reference to the material delivered to the plant, the master says:

"The Destructor Company claims that it relied on these representations by the city as to the approximate composition of the city's refuse, and so designed this plant that it would properly burn refuse of substantially those proportions, with reasonable variations one way or the other. The gas passages through the furnaces, the combustion chambers and boilers, the air draft, preheater, and so into the chimney stack, were carefully designed to accommodate the gases which would be produced in burning refuse of the composition and approximate proportions so stated, with reasonable variations one way and the other. The Destructor Company found, after putting the plant into operation, that the seasonal variation of refuse in Atlanta is extreme. The proportions of rubbish and stable manure remain reasonably constant throughout the year, but in winter the proportion of garbage falls off from the 45 per cent. represented to approximately 10 per cent. and the proportion of ashes rises from the 15 per cent. represented to approximately 50 per cent. The effect of this excessive proportion of ashes in the fall and winter months was to cause excessive heat in the furnaces. The company corrected this only in part by wetting down the refuse in the pit. On the other hand, in the summer, the proportion of ashes actually delivered by the city at the plant has fallen from the 15 per cent. represented to almost nothing, and the proportion of garbage has risen from the 45 per cent. represented to probably sometimes as high as 70 per cent., and is very wet, consisting largely of watermelons and watermelon rinds, and soaks the paper and other rubbish, making it wet, so that the whole mixture does not contain enough heat-producing element to burn itself and evaporate the excessive moisture. The city could prevent this extreme seasonal variation by storing the excess of ashes in the winter time and using it to mix with the excess of wet garbage in the summer time, when ashes are deficient. Even without storing ashes from winter, the city could have procured ashes in the summer time and delivered them at the plant. This is shown by the fact that the company itself did this when the city did not. The city did so after the court's injunction order was granted in August, 1914. Proper cooperation between the collection department and the incineration department

is absolutely necessary for the full success of the plant's operation, and this has been sadly lacking."

With reference to the delivery at the plant of street sweepings with dirt, sand, and mud, the master says:

"Besides these variations in the proportions of refuse actually delivered at the plant, the refuse very often contained considerable amounts of material not specified in the contract at all, and not suited for burning in the furnaces, such as street sweepings and mud taken from sewer inlets, consisting of dirt and sand."

Coming to the question of tests, the master says:

"After putting the plant into operation in August, 1913, the Destructor Company made certain changes, as, for instance, substituting flat grate bars for the two-ridged grate bars in each furnace grate; by changing the size of the grab buckets which move the refuse from the pit to the hoppers above the furnaces; by changing the shape of the hoppers; by installing window glass in the plant and otherwise preparing the plant for the test. From the evidence, it is customary with plants of this kind to operate a number of months before running an official test. The board of health of the city, on August 30, 1913, about two weeks after the plant had been put into operation, suggested that the first test be held soon after that date; the claim being that it would be difficult to get a sufficient amount of garbage if the test was delayed to any extent beyond that time. Under authority of a resolution of the general council, passed in August, 1913, the mayor appointed Mr. Lederle, an engineer, to represent the city on the test. The contract provides that 'The first test shall be made at such time as the contractor (the Destructor Company) states that he is ready,' and the company did not elect to state that it was ready for the first test until December, 1913. On December 20, 1913, the Destructor Company wrote the city (addressing it through the board of health, that being the department of the city in charge of the collection of refuse, and the department mentioned in several places in the contract as the city's agent), giving notice that the company would be 'ready for the official test during the early part of the week commencing December 29, 1913,' and requesting that the city would make arrangements accordingly to deliver at that time refuse of the quantity and character called for by the contract for the test.

"The board of health considered this request for a test at its meeting held December 26, 1913, and refused it, and the same date sent notice to the company in the following terms: 'The board of health, by motion of the mayor and Mr. Brandon, decline to accept the official test of the plant at this time, owing to the fact that the present run of refuse does not contain sufficient garbage, nor nearly so, to run a 45 per cent. garbage test, and the city cannot produce enough of this class of refuse now, and, further, owing to the fact that the chairman of the sanitary committee and the chief of the sanitary department show that the plant is not in such physical condition that the board could accept an official test at this time.' A representative of the Destructor Company thereupon explained to the members of the board of health that the company claimed that the contract expressly gave the company the right to have the test run whenever the company stated it was ready, and that enough garbage could be accumulated in a few days by laying aside the garbage in each day's delivery. The board of health, however, refused to change its position in the matter of the test, but, instead, referred the Destructor Company to the general council. The general council had passed on the contract before it was signed. The contract so passed on provided that 'the first test shall be made at such time as the contractor states that he is ready.' The city had already appointed an engineer to represent the city on the test. The board of health had control of the delivery of refuse, and, though it might have been difficult, yet in the course of several days it could have accumulated enough garbage for the test, as, indeed, it did two or three months later, when the proportion of garbage was about the same.

"The second ground given by the board of health for refusing to permit the tests, viz., that certain city officials asserted that the plant was not in physical

condition for a test, was one of the very things which the contract said should be determined by test. Such adverse prejudgment was then in fact advanced as a reason for refusing the company its right to a test. If, on the other hand, by 'physical condition' the board of health meant to refer, not to conditions affecting operation, which were to be determined by test, but to claimed defects in construction, not affecting operation, then such defects in construction, if any such were .claimed, were not a good reason for refusing to test, since the result of a test would not have affected the city's rights based on any such structural defects. It is a fact that the transporting machinery in the company's plant had not, during the fall, been working satisfactorily. The cranes especially had given considerable trouble and had had frequent breakdowns, which would put usually one of them out of commission from a few minutes up to as much as two days. Many of these breakdowns were of a very minor nature, some more serious, but doubtless caused to a great extent by the intense heat in the building, that resulting from the burning of a large percentage of ashes which had been delivered to the company during the fall and winter. As the city had sole control of the collection of refuse, no official test could be run unless the city supplied the refuse for it.

"I conclude, therefore, that the city was properly notified of the Destructor Company's desire to run a test early in the week commencing December 29, 1913, and that the city positively, arbitrarily, and unnecessarily refused. I find that the plant was in proper condition at this time to be tested. The company contends that, if a test had been run at this time, the plant would have complied with all the guaranties of the contract. This is testified to by the company's chief engineer, an expert witness, and the company claims that this testimony is supported by the results of certain preliminary unofficial tests run by him in November, 1913, and by the fact that on December 31, 1913, the plant burned all the tonnage delivered at the rate of 300 tons in 24 hours, and on December 30, 1913, burned in 20½ hours all the 249 tons of refuse delivered. This was at the rate of 290 tons in 24 hours. It is very difficult to say what the plant would have done, had this test been run. I am therefore not prepared to make a finding on this point."

The master then says that on December 31, 1913, Councilman Ashley, chairman of the sanitary committee of council and a member of the board of health, wrote specifying certain things which he insisted should be done to the plant, all of which was done by the company, except the burning of dead dogs on the grates, and, as to that, Mr. Ashley acknowledged he was wrong. The report proceeds: That throughout the pendency of this contract the company has shown constant desire to overcome the mechanical difficulties which have developed and to make the plant work well, without regard to who was responsible for the difficulties. With this in view, it has installed at its own expense many improvements to the plant.

The Destructor Company, then, according to the master, after failing to get a test through the board of health, on January 5, 1914, wrote the mayor and general council requesting that material be supplied for a test. The letter to the mayor and general council is then quoted. On January 15, 1914, council passed a resolution to the effect that, Mr. Frank Lederle having been employed to represent the city, he represent the city in a test, and expressed it as the sense of the council that the company should communicate with the mayor of the city when they were ready for the test, giving the mayor five days to have the proper mixture of garbage and rubbish for the test. Since the passing of this resolution Mayor Woodward, whether expressly authorized by it or not, has assumed to represent the city government in all dealings with the company as to the testing of the plant and the carrying out of the contract.

Immediately after the passage of this resolution Mr. Dowd, the representative of the company, went to Mayor Woodward and requested that material for a test be supplied by the city at the earliest possible moment. The mayor insisted that the plant was not completed, and should first burn 250 tons of refuse a day for two weeks before running a test, and insisted that the test, when fixed, should be on Saturday; but he agreed that the city would supply the material for a test beginning Saturday, February 14, 1914. The Destructor Company, accordingly, on February 5, 1914, sent Mayor Woodward notice in writing of its readiness to run a test on February 14th, and requested that the city have the proper mixture of refuse collected for that date. By Friday, February 13th, the day before the date set for the test, the city had collected at the plant a pile of garbage containing about 80 tons, as compared with 112½ tons necessary for the test. The chief of the sanitary department intended to complete, on the 14th, the collection of the rest of the garbage necessary for the test, as well as 137½ tons of rubbish, ashes, and stable manure, and also to deliver into the pit the ordinary run of refuse in sufficient quantities to keep the plant running up to the beginning of the test.

According to the report there was rain on Thursday, and on Friday, about the middle of the day, this rain turned to sleet. The temperature fell to freezing, and the rain froze on the streets, and made them quite slippery, and hauling was difficult, as was shown by the fact that horses and mules fell down in the streets. There was a consultation then between Mr. Dowd and Chief Jentzen of the sanitary department about the collection of refuse for the test the next day, as well as refuse to keep the plant running in the meantime. Chief Jentzen, Mr. Dowd claims, said it would be impossible to collect such refuse. After such consultation Mr. Dowd interviewed Mayor Woodward and suggested that, because of the difficulties of collection, the test be postponed until Tuesday, February 17th. The mayor said he did not care whether the test was held or not. Later that day another meeting between Mayor Woodward, Mr. Dowd, Councilman Ashley, chairman of the sanitary committee of council, and Chief Jentzen, was held in Chief Jentzen's office, and Chief Jentzen reiterated that it would be impossible to collect the amount of refuse needed, and, in Mr. Dowd's hearing, sent instructions by telephone to the city stables that the collection carts should not go out on Friday afternoon.

The master says, if there was no explicit agreement to postpone the test from Saturday, February 14th, to Tuesday, February 17th, there was no refusal by the city of Mr. Dowd's suggestion to that effect, and Mr. Dowd left the conference with the understanding that there was to be such a postponement. In accordance with this understanding, the company's engineers, who were to run the test, did not go to the plant early on the morning of Saturday, February 14th. Mayor Woodward, however, instructed Councilman Ashley and Mr. Lederle to go to the plant on Saturday morning. They accordingly appeared at the plant Saturday morning about 7 o'clock. Mr. McEwen, the company's plant superintendent, was there and saw them. They did not speak to him and soon went away. They made no attempt to notify Mr. Primrose, the company's engineer, by telephone

or otherwise, of their readiness to run a test. Even if the company's engineer had been at the plant ready to run a test that day, the test could not have been run, because the city did not have enough material ready to run a test. The city had only a pile of garbage containing about 80 tons, and lacked the remaining garbage required to make up the 112½ tons, and also the 137½ tons of ashes, rubbish, and stable manure. Furthermore, the city did not have ready at the plant on Saturday morning the empty carts needed to transfer the garbage pile into the pit for test. The icy condition of the streets continued during Friday afternoon and night and Saturday morning, so that on Friday the city was able to deliver into the pit only 117 tons of the regular run of refuse, which was all burned by 4 o'clock Saturday morning. On Saturday only 108 tons were delivered.

As to this he finds: That it was through no fault of the Destructor Company that the test was not run on Saturday, February 14, 1914, but it was because of unusual weather conditions, which made it practically impossible for the city to deliver the required mixture of refuse for the test. The plant apparently was in good running order and could have been tested on that day. That Mayor Woodward announced to the newspaper reporters on February 14th that "the company had thrown down the test," and, in substance, stated that this action took away the last legal grounds on which the company might claim payment of the final $135,000 due on the plant. Then it is stated that on Monday, February 16th, Mr. Dowd, the company's representative, called on Mayor Woodward and requested that a test be held next day, or at any time within the next few days, using for that purpose the garbage which had been collected for the intended test on February 14th, which was still on hand. This the mayor positively refused, and ordered the garbage dumped into the pit. After stating some other facts about conferences, the master says: That the mayor at last consented that a test be run on Saturday, March 7th, and gave Chief Jentzen instructions to collect refuse needed for the test. That the city did not have the necessary amount collected by the 7th of March, and the company, in its letter to the mayor of that date, requested that the test be held as soon as possible, between then and March 14th. That Mayor Woodward consented for the test to be held beginning Saturday morning, March 14th. That before this test the mayor gave instructions that 250 tons of refuse each day be delivered at the plant. The company claims that on the preceding Sunday it had been necessary to operate the plant burning refuse, and that they had not been able to shut down the plant on that day to clean out the furnaces. The company requested Mayor Woodward March 12th that there be a light delivery of refuse into the pit on the day preceding the test, so that there might be no doubt of its all being burned up and the pit clean by the morning of the test. Mayor Woodward acceded to this request, but "solely upon condition that you shut down no furnace, but keep them all in service." This letter set the time for beginning the test at 9 o'clock in the morning. By observing this condition imposed by the mayor, the company was unable to shut down or clean out the furnaces and gas passages, and had

to begin the test with whatever of dirt, slag, and dust had accumulated in the furnaces and the passages during the two weeks preceding.

The master then finds that the company should have had an opportunity to clean out the furnaces before the test, as that is the usual custom prevailing in testing all kinds of plants. The company further claims that the plant suffered in this test under a second difficulty, for which, however, the city was in no way responsible. The refuse which was delivered to the plant on the day before the test was all burned by 4 o'clock in the morning of the day of the test and the fires then had to be banked. This prevented the beginning of the test with a running start, as the contract provides.

The report says: That a test of 24 hours was run, beginning Saturday, March 14, 1914, about 9 o'clock a. m., and that on this test the plant burned 225 tons of refuse, thus falling short 10 per cent. of the 250 tons guaranteed. That on this test the plant's steam production, as claimed by the company, was 2.47 pounds of steam per pound of refuse consumed, as compared with 1.96 pounds mentioned in the guaranty, but, as claimed by the city, was only 1.76 pounds of steam per pound of refuse. The difference between the parties on this point depends on the proper interpretation of the contract, as will be explained in discussing the August test. The finding is that the delay in running the test from December 29th to March 14th was the fault of the city, that throughout this time the company was persistently endeavoring to induce the city to supply the refuse required for a test, and that the plant was in suitable condition to be tested during that period.

The master's report then refers to the fact that certain changes were made by the company after this March, 1914, test. The master says: That before the March test Mr. Primrose, the company's chief engineer, went over the drawings showing the contemplated changes with Councilman Ashley, chairman of the sanitary committee of general council of Atlanta, and, himself an engineer. Mr. Ashley made no objections to the proposed changes. That in its letter of March 16, 1914, the company notified the city that it would at once set about making these changes, and in doing so would shut down the furnaces one at a time, keeping the other two furnaces in operation to dispose of the city's refuse. That the changes would take about four weeks, and it would then ask for another test. While the changes were being made in accordance with this letter of March 16th, one furnace was shut down at a time to permit the changes, and the other furnaces were kept running night and day, including Sundays, to burn the refuse. That the city did nothing to let up on the delivery of refuse at the plant, and it accumulated there faster than the two operating furnaces could burn it.

Mayor Woodward wrote on March 24th and 25th, complaining of this condition. The company wrote the mayor on March 24th and April 8th, fully explaining the situation, but before the changes had been made on the third furnace, Mayor Woodward sent orders by Chief Jentzen to the company's superintendent at the plant that no further work should be done on Sundays, and that the police had been

instructed to enforce these orders. Accordingly, after Sunday, April 12, 1914, the company did not do any work at the plant on Sundays for three months, until Sunday, July 12, 1914, except to keep the furnaces banked over Sunday, and did not even clean out the furnaces on Sunday. The company, in its letter to Mayor Woodward of April 8, 1914, stated that it had completed the changes in two of the furnaces, and again stated that, as soon as the changes should be made in the last one, the company would notify the city that it was prepared to run a second test. To this Mayor Woodward replied under date of April 17, 1914, saying, among other things:

"I claim that you have no standing whatever to demand tests, only such as the city of Atlanta may agree to, and that all such tests, in the future, if any should be made, will be entirely as the city directs."

On April 18th the company wrote that the changes in the furnaces were completed, and they would be ready to run a test on April 30th, and asked the city to prepare the proper mixture of refuse and have its representatives present on that date. On April 20th the mayor wrote that the city was not ready for a test at that time, and neither was the plant; that "the pit of the plant has not been clear of garbage since the 16th of March." The mayor in that letter complains about the shutting down of the furnaces, one at a time, following the making of the changes, "in order to drill or hammer the slag out, of which there is about 50 tons in the chamber." The master finds that the city, through Mayor Woodward, thus again refused to test at the time requested by the company, and that such refusal was arbitrary and unnecessary. The report then says that the work at this plant is clearly a work of necessity for the protection of the public health, as is, in substance, alleged in the bill of complaint, paragraphs 57 and 67, and, in substance, admitted by the city's answer, paragraphs 57, 59 and 67, and as is testified by Councilman Ashley, chairman of the sanitary committee of the general council and member of the board of health.

According to the report, on April 30, 1914, the date on which the company had requested and Mayor Woodward refused that a test be run, the plant was in proper condition to be tested; that on that date it burned 263 tons of the city's ordinary refuse. A letter was written by the company to Mayor Woodward on April 27th, in answer to his letter of April 20th, in which he refused to hold a test on April 30th, and in acceptance of Mayor Woodward's insistence that the plant should be run for some time before testing, the company, in this letter, suggested that the plant be run up until May 25, 1914, and requested that Mayor Woodward agree to a test within a fortnight following that date. Getting no answer to this request, the company wrote Mayor Woodward again on May 7, 1914, renewing this request, and under date of May 14, 1914, the mayor replies as follows:

"Your letters of April 27th and May 7th received. Taking the general condition of your plant into consideration, and its inability to perform what the contract and specifications call for, I have considered it unnecessary to give any thought as to the time when a test shall be run. The type of furnace that has been placed there now is entirely different from any heretofore attempted to be used, and is entirely different from what your contract and specifications call for. As I stated to you in my former letter, the city of At-

lanta is in position to decline to take your plant at all. It never has fulfilled the contract and, as regards to your stating or calling for a test on May 25th, I am satisfied that the plant will be in no condition to go into a test. At the present time we are not furnishing 45 per cent. of the garbage, nor nothing like that amount, and until such time as we can furnish the regular amount of garbage, and when you get your plant in useful operation, possibly within the next 60 or 90 days, there need be no talk of setting a day for a test."

The master says:

"Here again, the city, through Mayor Woodward, positively, and in my opinion arbitrarily and unnecessarily, refused the company's request for a test in the fortnight following May 25, 1914."

He says the plant was then in condition to be tested, as all the changes had been made. The report says that Mayor Woodward's letter of May 14, 1914, was the first objection received by the company from the city making the claim that the changes the company had made after the March test altered the type of the furnaces, so that they no longer conformed to the contract and specifications, but that from this date, this claim has been the main reason put forward by Mayor Woodward for refusing the test, and, when the plant was again tested, in August, 1914, for refusing to recognize that as an official test binding on the city. The master says it is therefore important that the nature of these changes be described. He says that the Destructor Company, as its justification for these changes, relies on the clause in the contract which reads as follows:

"If in the tests the plant does not come up to requirements, or does not fulfill each and every one of the guarantees and specifications, the city may refuse to accept the plant; however, every reasonable opportunity shall be given the contractor to make changes in the incinerator if, by so doing, it may be made to satisfactorily fulfill the requirements and guarantees."·

The master then gives this description of the changes made and his opinion as to the changes:

"The grates of the furnaces where the refuse is burned are supplied with a forced draft of air blown through holes in the bottoms of the burning grates, thus supplying with such air draft the oxygen which is essential for the combustion of the refuse. To further facilitate such combustion, the air for this forced draft is heated in a device known as the 'forced draft air preheater' before being supplied through the burning grates of the furnaces. The heat for the forced draft air preheater comes from the waste gases after they have passed through the boilers, which operate the plant. These gases have performed their full work in making steam in the boilers and are of no other economic value. Directly below the burning grate in each furnace is a chamber known as 'the clinker cooling chamber.' When the refuse on the burning grate has been sufficiently burned out and reduced to clinker and ash, the burning grate is drawn back, and the hot clinker and ash fall upon the clinker grate at the bottom of the clinker cooling chamber. The clinker cooling chamber is tightly inclosed. It comes between the forced draft air heater and the burning grate, so that the air for the forced draft, after being preheated in the preheater, passes through the clinker cooling chamber, where it acquires additional heat from the hot clinker and ash, and then passes through the bottom of the burning grate into the burning refuse.

"The change made after the March test, which is now objected to by the city, is wholly in the clinker cooling chamber. Before the change, the forced draft, after leaving the preheater, had to pass through holes in the bottom of the clinker cooling grate and through the clinker and ash lying on this grate. The company found, in the fall and winter months, when the refuse

to be burned was dry and contained large amounts of ashes, besides dirt and sand in the street sweepings, that the resulting clinker, which was dumped from the burning grate to the clinker cooling grate below, was very dense and often almost molten, like lava, so that it spread out over the clinker cooling grate like a pancake, and stopped up the holes in the bottom of the clinker cooling grate, and would not let enough of the forced draft air through to properly supply the fires on the burning grate above. The change was made to remedy this difficulty. The change consisted in chipping out the brickwork in the walls of the clinker cooling chamber for a few inches in depth and inserting cast iron boxes or ducts from a point below the clinker cooling grate to several feet up on the walls of the clinker cooling chamber. These ducts have holes near the top a couple of feet above the clinker cooling grate, and below the burning grate.

"After the installation of these ducts, the air from the forced draft air preheater passes into the same place as before, viz. the clinker cooling chamber, but now passes only partly through the old holes in the bottom of the clinker cooling grate and partly through the ducts around the clinker cooling grate. These ducts, being of cast iron, absorb heat by radiation from the hot clinker and act on the clinker cooling grate and the air which passes through the ducts absorbs this heat. Practically as much heat from the clinker and ash on the clinker cooling grate is conveyed to the burning grate above as before. The very practical advantage is gained by this change that, however dense and molten the clinker may be now, the air draft is not checked, and the burning grate gets at all times a sufficient air supply. This change does not alter the Heenan type of furnace called for in the contract and specifications. This change would not have been required, if the refuse delivered by the city would always be approximately the test mixture.

"It is true that the ducts around the clinker cooling grate, introduced by this change, are not shown on the blue print which was referred to in the contract signed by the parties, nor are they described in the paper entitled 'Description of Proposed Refuse Destructor Plant for City of Atlanta,' which is one of the papers physically attached to the contract. That description describes the clinker cooling grate and its operation as originally constructed and before the ducts had been introduced by the change made after March test. The furnaces in the Atlanta plant work better since the change has been made, and the city's objection to it seems to me captious."

The master then refers to the city's requirement that the plant burn dead horses in this way:

"In April or May the city began delivering dead horses and mules at the plant and demanded that the company burn them. The company gave in to this demand and burned all such large animals delivered. The weight of these animals was included in the tonnage burned, but, except for such weight at 25 cents a ton, nothing extra was allowed for the extra expense of burning these animals. Such burning required extra labor in jacking the carcasses into the combustion chamber, and required the shutting down of the furnace while the carcass was being put in. The delivery of such carcasses continued about three or four months, until after this court's injunction order was granted in August, 1914, and during this time about 134 large carcasses were delivered by the city at the plant and burned by the company. This interfered materially with the operation of the plant."

The master says the only clause in the contract on this subject is on page 2 of the "Specifications by Contractor," which reads as follows:

"Openings sufficiently large for placing carcasses in the combustion chamber will be provided for, and closed by means of an airtight, brick-lined door."

The master then says that on June 26, 1914, the mayor wrote, setting August 1, 1914, as the time limit beyond which he forbade the doing of any work on the plant, and notice to the same effect was

232 F.—49

reiterated in his letter of July 25, 1914. On June 29, 1914, the company wrote the mayor saying:

"We wish to get a test on July 15th, and would ask that you agree to have the material ready on that day."

On July 1st the mayor replied, positively refusing this request, on the ground that the plant, because of the changes made, did not, as he claimed, conform to the contract. The master holds that Mayor Woodward's refusal to test on July 15, 1914, as requested by the company, was, in his opinion arbitrary and unnecessary; that the plant was in condition to test on that day. After some correspondence and some personal interviews, Mayor Woodward, on July 25th, said that the company could run a test on August 7th or 8th, for its own satisfaction, but that the city would not recognize it as an official test, or of any value or binding effect. In this letter the mayor reiterated his notice that no work on the plant would be permitted beyond the 1st of August. The company answered July 29, 1914, assenting that the test be held August 7th or 8th, and it was subsequently fixed to begin on Saturday morning, August 8, 1914. It is then said that for some time preceding the test a decidedly acrimonious correspondence had been passing between the company and the mayor, in which the company complained of his repeated refusals to test, of his shutting down the plant on Sundays and sending in many dead horses to be burned, the delivery of wet garbage without ashes, and other things which the company deemed unfair; and Mayor Woodward complained that the company was using wood, coal, and ashes of its own to mix with the garbage, and demanded that the pit be cleaned up each night, and complained that unburned material was passing through the furnaces.

The master then says: That on Friday, August 7, 1914, the day before the test, the city dumped into the pit between 280 and 284 tons of very wet refuse. At 7 o'clock Friday morning there was already about 20 tons in the bottom of the pit, carried over from the previous day. That the stuff was so wet that the company had to add to it, to make it burn, about 30 tons of ashes which the company itself had collected. That this made about 334 tons of material, about 304 tons of it being wet material delivered by the city, to be burned by Saturday morning in order to clean the pit for the reception of the test material. That at the normal rating of the plant, a little over 10 tons an hour, to burn this would have taken about 32 hours, or until about 3 o'clock Saturday afternoon. That during Friday morning the company ran the plant slowly, so as not to run out of fuel before the beginning of the test, as it had done on the March test. That the city's deliveries on Friday were considerably heavier in the afternoon than in the morning, and that the company, from then on, ran the plant at its utmost capacity, in an effort to dispose of the stuff by Saturday morning. That the city's representatives, Councilman Ashley and Mr. Lederle, and the company's engineer, came to the plant on Saturday morning to run the test. That the time of beginning was then postponed by the city, with Mayor Woodward's consent, until 11 o'clock Saturday morning.

About that time he came to the plant. That there was then between 50 and 60 tons of refuse in the pit. The company's engineers complained of the heavy deliveries on Friday. Mayor Woodward complained of the stuff remaining in the pit and refused to wait any longer, and about 11:30, over the protest of the company's representatives, he directed Chief Jentzen to dump into the pit, on top of the tonnage which was already there, the garbage which had been collected for the test. Mayor Woodward, Councilman Ashley, and Mr. Lederle then refused to take any part in running the test that day and went away. The master says:

"I find that the company was not responsible for the extra quantities of wet refuse which were delivered on the day before the test."

Then it is said: That soon after Mayor Woodward, Councilman Ashley, and Mr. Lederle left the plant on Saturday morning, August 8, 1914, Chief Jentzen, under Mayor Woodward's orders, began dumping into the pit the garbage which had been collected for the test. That the amount of garbage in the bottom of the pit when this dumping began was measured in feet, sampled, and estimated in weight at about 53 tons of wet, soggy stuff. That at 11:50 Saturday morning, August 8, 1914, the company began to run the 24-hour test, and ended the test at 11:50 on Sunday morning. The test was run, and the readings of the various instruments taken by and under the direction of Gabriel R. Solomon, Esq., of the Solomon-Norcross Company, engineers, of Atlanta; he having been retained by the company just before the test as an impartial engineer to run it. That Mr. Solomon made a report on the performance of the plant on this test, to the correctness of which he testified on the trial. As to this report the master says:

"I find that it is true, and correctly sets forth the performance of the plant on the test. Mr. Solomon's report contains a few matters which he learned from others, and to these parts objection was made by the city, and they were not received as evidence. The truth of these parts was, however, proved by other witnesses."

The master, as shown by the foregoing, evidently thought that the company was diligent in requesting tests of the plant, and that the city was at fault in refusing them. I have examined the parts of the evidence most material on this question, and I am satisfied that the evidence is sufficient to justify the master's finding.

Section 5 of the specifications, which states of what the refuse would consist, and the proportions, has been quoted above. I think this means exactly what it says—that the city represented that approximately the refuse would consist of those proportions. Of course, this must be taken in connection with the common sense of the matter, and this is that these proportions would necessarily vary somewhat with the seasons. As the master says in his report, these proportions of refuse vary widely between summer and winter, and somewhat all the time, but finds that the proportions stated are about the average of the year in Atlanta. If practically these proportions were used in the tests which were to be run to determine the efficiency of the plant, I do not think it was meant that the city must furnish close to these proportions at all times. This could not have been true, and allowed for the com-

mon sense and ordinary knowledge of the persons entering into the contract. Of course, it follows that, if the plant stood the tests on a mixture approximating what is stated in the specifications, then, as to this feature, the company would have complied with its contract.

We come naturally and in order now to the next question of importance involved in this case, and that is: Did the plant comply with the provisions of the contract that it should destroy 250 tons of refuse in 24 hours? On the first test, made in March, 1914, it appears that the plant failed in this respect, and destroyed only 225 tons, falling short 25 tons of the requirements of the contract. The master says that immediately after this test of March, 1914, the company notified the city in its letter of March 16th that it would at once set about making certain changes in the plant, and would shut down one furnace at a time, etc. On May 14, 1914, the mayor wrote, objecting to these changes and claiming that the plant no longer conformed to the contract and specifications, and since that time the mayor has put this forward as a reason for refusing to regard the tests made as official tests. The character of changes made has been referred to above, and the master says that the changes made did not alter the Heenan type of furnace called for by the specifications. The master concludes that:

"The furnaces in the Atlanta plant work better since the change has been made, and the city's objection to it seems to me to be captious."

I was wholly unable to see during the argument, and I am unable to see now, how this change in the furnaces could be called such a substantial and radical change, under all the circumstances, as to give the city the right to repudiate its obligation under the contract. Certainly this is so if the effect of it was to make the plant work better and destroy the amount of tonnage per day required by the contract. On the subject of the plant's capacity to destroy the refuse, the master finds this: He quotes from the contract:

"That the plant shall be capable of destroying in normal operation 250 tons of refuse per 24 hours without the use of additional fuel."

And then he proceeds:

"I find that on the 24-hour test of August 8, 1914, the plant destroyed 278.89 tons of refuse without the use of additional fuel. This was 11.55 per cent. more than the 250 tons mentioned in this guaranty."

I shall refer hereafter to a test run in May, 1915, by the gentlemen appointed by the court to make such a test; but my conclusion is, from what the master finds and from the evidence on which he acted, that the plant is capable of destroying 250 tons of refuse in 24 hours without the use of additional fuel. The plant is not called upon to do this usually, and probably not very often; but it must be concluded from the evidence that it can do it when necessary and when required.

In reference to the guaranty in the contract, as follows:

"That the number of pounds of refuse burned per hour, per square foot of that grate area upon which final combustion takes place in the proposed plant, shall not be less than 115 pounds"

—the master finds that:

"The grate area of the three furnaces is 180 square feet. That being so, this guaranty in different language covers substantially the same ground as the first guaranty, viz., the capacity of the furnaces. The 115 pounds per square foot of grate area, multiplied by 180, the number of square feet of grate area, gives 20,700 pounds of refuse to be burned per hour. Multiplying this by 24, the number of hours in a day, gives 496,800 pounds as the number of pounds of refuse to be burned per day. This is almost the same as the 500,000 pounds of refuse, or the 250 tons per day, covered by the first guaranty."

The master then finds that:

"On the 24-hour test of August 8, 1914, there were burned 278.89 tons, which is 557,780 pounds of refuse. This is 23,240 pounds per hour, and for the 180 square feet of grate area is 129 pounds per square foot of grate area, as compared with the 115 pounds mentioned in this guaranty."

In other words, if the finding as to the 250 tons per day is correct, it covers this guaranty as well.

There is a guaranty in the contract that:

"No nuisance offensive to persons outside of the plant shall be created in the ordinary operation of the plant; that the combustion shall be completed—i. e., that all combustible gases shall be fixed by oxygen, and that no dust, odors, or noxious gases shall escape from the chimney or the building, so that the plant shall be practically smokeless in operation."

On this subject, in the report of the Solomon-Norcross Company, engineers, of the test of August 8, 1914, this is said, first referring to the provision of the contract that no nuisance whatever shall be created, quoted above:

"In my judgment this condition is satisfactorily met by the plant operation. I observed carefully, at frequent intervals, the condition in the various parts of the plant. Only at rare intervals could smoke be seen coming from the chimney. On two occasions of about one minute duration, a black smoke issued from the chimney, but almost immediately disappeared in the air. Investigation indicated that this was caused by the simultaneous firing of the several furnaces, with charges containing a large amount of paper and rubbish, and not to the design of the furnace, and that the color was probably due to the presence in the chimney gases of carbon, small particles of burned and charred paper."

The master further finds that:

"Mayor Woodward, Councilman Ashley, and other of the city's witnesses testified to complaints being made by citizens at various times. The fact of making complaint, however, is only hearsay, and not proof that there was any justification for the complaint. I find that there were smells coming from the plant at times, and especially during August, 1914, when witnesses have testified that the plant was unable to get the pit completely empty for several weeks, and that the sour garbage in the bottom, when uncovered, smelled to heaven, and that the smell could be noticed several blocks away. Councilman Ashley testified that it was only the stuff in the pit that smelled, and that only when it had been in the pit a long time. There were a number of witnesses from the W. & A. roundhouse, just about 400 feet from the plant. They testified that the smell from the direction of the plant was very bad in summer of 1914, when the wind blew from that direction. This may have been the smell from the pit, in August, mentioned above. The most of the witnesses characterized the smell as like excrement or 'night soil.' There is a place near the plant where the city pumps 'night soil' into the sewer. There were also some witnesses who testified that, when the wind blew from the direction of the plant, they smelled, in the Austell Building and one or

two other places, smells which they thought came from the plant, several blocks away, which caused them to shut down their office windows. Some of these smells probably came from the plant; but they were only occasional, and not, apparently, of a serious nature. I find that at various times, for short periods of time, smoke was emitted from the chimney of the plant. This happened at long intervals, and I do not think that there has been any real nuisance in the operation of the plant. When the plant is properly operated, no offensive smells should come from the stack."

Counsel for the city differ with this, and earnestly claim that the plant was offensive while in operation, and that the smell was beyond anything allowed for by the contract. I do not think the evidence is such as to justify the court in differing with the master about this. He concludes that the plant, when properly operated, should produce no offensive smells, and I do not see why it should, if the refuse is delivered in the proper way and destroyed as delivered, or within a reasonable time after delivery, and I do not think that it is satisfactorily shown that the plant will create such odors.

Another provision of the contract is:

"That at no time during the normal operation of the plant, including charging, stoking, and clinkering, shall the temperature in the combustion chamber, due to defects in design or construction, and as ascertained from a continuous record of a Fery radiation pyrometer, fall below 1,250 degrees Fahr., and that an average temperature of at least 1,500 degrees Fahr., shall be maintained in the combustion chamber."

It is then found: That in the 24-hour test of August 8, 1914, at no time during the normal operation of the plant, including charging, stoking, and clinkering, did the temperature in the combustion chamber, due to defects in design or construction, fall below 1,250 degrees Fahr., and that an average temperature of 1,633 degrees Fahr. was maintained in the combustion chamber. Only once, and then only for a short period, and in only one of the three combustion chambers, did the temperature fall below 1,250 degrees Fahr. That at 4:45 p. m. the temperature in the combustion chamber of furnace No. 3 fell below 1,250 degrees and registered 1,100 degrees. This was not due to defects in design or construction. The reason was that at that time this furnace was being fed with wet garbage, because for several hours preceding this time only wet garbage, including rotten watermelons, had been dumped into the pit. "That the temperatures were not ascertained from a continuous record of a Fery radiation pyrometer, but by other good standard instruments, viz. a Foster fixed focus pyrometer and a thermo couple pyrometer, which determined the temperature as well." As I understand the testimony on this subject, the finding of the master is abundantly supported by the evidence.

Another provision of the contract is this:

"That the residual from the furnace shall be thoroughly burned, hard, innocuous clinker and ash, free from organic matter, suitable for concrete work, road foundation," etc.

As to this the master says:

"I find that on the 24-hour test of August 8, 1914, the residual from the furnace on this test was thoroughly burned, hard, innocuous clinker and

ash, substantially free from organic matter and suitable for concrete work, road foundation, etc. The furnaces burned 278.89 tons, which is 557,780 pounds of refuse, on that day. The clinker pile was thoroughly raked for unburned material in the residual, and only 235½ pounds of partly burned organic matter were found. This weight included the water absorbed by this material from the water put on the clinker pile by the city. This consisted chiefly of banana stalks, water melon rinds, and newspaper. This partly burned material, including the water absorbed by it in the wetting down of the clinker pile, is only one pound in 2,372 pounds burned, or .04 of 1 per cent. This small amount of partly burned material was negligible. Even this small portion of unburned material would, in all probability, have been burned up in the hot clinker pile, if the pile had not been wet down as the clinker was dumped on it."

This has been a serious subject of argument since this case commenced. Undoubtedly there were small particles of unburned material which came out with the clinker. It is perfectly clear, and the evidence all shows, however, that these particles would have been completely destroyed in the clinker pile if it had been left standing a little while on the yard; but water was immediately applied to it, for the purpose, as the city claims, of cooling it to enable the employés to haul it off. This does not seem to me to be a just objection to the efficiency of the plant, when, in fair operation, it certainly seems that with reasonable co-operation between the city and the Destructor Company this could have been largely, or even entirely, remedied by allowing the clinker to remain for a short time before removing it. How these little pieces of paper escape from the terrible heat to which they are subjected is a mystery to me, as it appears to have been to Dr. Coon, who was head of the commission appointed by the court to run a test, to which I will refer later.

It will be seen from the guaranty with reference to the residual that it must be suitable for concrete work, road foundations, etc. There was ample testimony to support the finding of the master that the clinker complied with this guaranty of the contract, supported, I think, by the testimony of Mr. Solomon, of the Solomon-Norcross Company, and also by that of Mr. Foster, the president of the Destructor Company, and of Dr. Rudolph Herring, the sanitary engineer, and Col. William L. Peel, of Atlanta. Col. Wm. L. Peel testified in reference to this clinker as follows:

"I think it is about as valuable as crushed stone, because it will bind, and stone will not. Q. Did the stuff that you saw out there, had it matted and bound together? A. Yes, sir; where it had been traveled on sufficiently, it had matted and packed down smooth. Q. Did you see any foreign matter in there, except hard, innocuous cinder? A. Not a particle. Q. To what extent have the streets in that section of the city been covered with it? A. A number of streets there have been made passable and very good streets. Q. How long a stretch would you say you saw? A. Well, one or two blocks in a piece, maybe three blocks, and several pieces of streets, quite a number of them. * * * This stuff is too valuable to be filling in people's property with. It ought to all be used on the impassable streets over there in that part of the town; it is so valuable it ought to be put on the streets, instead of putting it on private property. Q. Do you think it is as good stuff as chert? A. I think it is better than chert; chert will wash, and wash away, but this, I don't think it will. It binds. Q. What would you say its commercial value would be? Give us an idea. A. It looks to me like it is as valuable as crushed stone."

There was other testimony on this subject, some of which seems to be a contradiction of that of Col. Peel. Certain citizens living in the neighborhood where this cinder was dumped objected to it, and thought it contained a considerable quantity of unburned and offensive stuff. But, taking the whole of the testimony together, I do not think it can be said that the master's finding is not fairly supported.

There is a guaranty in the contract as to the flues, dust collectors, furnaces, and combustion chambers being so arranged that it shall not be necessary to shut down more than one unit of the plant, and that for not more than 48 hours, in order to remove thoroughly all dust and ashes. The master finds that this was complied with, and that it was not necessary to shut down the plant longer than was provided in the contract. I agree with him in his finding on this point.

The guaranty in the contract as to the steam production is a question which has been much discussed. This guaranty is that the number of pounds of steam generated in the boiler from and at 212 degrees Fahr. per pound of refuse consumed shall not be less than the amount stated in the bid, and that amount is 1.96 pounds. The master calls the dispute on this subject "the principal dispute before me concerning the test of August 8, 1914." Mr. Solomon, of the Solomon-Norcross Company, reports as to this:

"I find that the rate of evaporation during the test was 1.953, which is less than the guaranteed rate by .007 of a pound or .36 of 1 per cent. The calculations from which this rate was determined are shown in the appendix. It will be noted:

"(1) That while the rate of evaporation fell below that specified by .36 of 1 per cent., the plant produced 11.1 per cent more steam from the 278.89 tons of refuse incinerated than it would have produced from 250 tons, the guaranteed amount, at the guaranteed rate of 1.96. In other words, there was available for power purposes, from the plant, because of its increased capacity, 11.1 per cent. more steam than was required by the guarantee.

"(2) That the material burned was not in accordance with the proportions stated in the specifications.

"(3) That in that portion weighed there was an excess of material difficult to burn, over the percentage specified.

"(4) That between the hours of 3 p. m. and 5 p. m. on Saturday garbage only was dumped into the pit. This mixture, being difficult to burn, naturally reduced the rate of evaporation. I noted that, while this material was being placed in the furnaces, the production of steam was so reduced that the pop valve in the steam discharge line failed to work, and the amount of steam produced was greatly below that which prevailed during the other hours of the test.

"(5) That the amount of refuse remaining in the pit from Friday was estimated as 52.91 tons. This material, because it had been at the bottom of the pit for a number of days, contained an excess of moisture, and did not conform to test mixture, and its volume was based on an estimate determined by measuring the depth of the material in the pit, and weighing samples taken at random to determine the weight of the balance. I believe my estimate on the amount of material burned, but not weighed, is conservative, and less than the tonnage actually in the pit when the test mixture was added; but a small error in estimating this tonnage might increase the rate of evaporation to the guaranteed rate."

On this question the master says:

"The plant produces steam in two, and only two, places: Unusable steam is produced in the furnaces themselves from the water in the refuse. This un-

usable steam passes off up the chimney stack with the other gases of combustion. (2) Usable steam, all of which is produced in the boiler. The company claims that the expression 'steam generated in the boiler' is used to distinguish the usable steam from the unusuable steam.

"The company claims that the purpose of the steam production guaranty is to insure to the city the production by the plant as a whole of surplus steam which could be utilized for power purposes. The company claims, therefore, that the steam generated or evaporated in the boilers by the economical operation of the plant as a whole should be measured, and that it is entitled to credit for the operation of the feedwater heaters. These feedwater heaters themselves produce no steam. They are accessories of the boilers, and the city's specifications require such boiler accessories. They utilize the exhaust steam from the auxiliary machinery to raise the temperature of the water coming out of the city main from about 78.9 Fahr. to about 203 Fahr. before the water is fed into the boilers. The steam from the auxiliaries so utilized by the feedwater heaters has already fully served its purpose as steam in running the auxiliaries, and has no value except as the remaining heat in it is thus used in the feedwater heaters. This is the utilization of what would otherwise be a waste product, and is one of the economies in this plant's operation.

"The city claims, on the other hand, that under this guaranty no credit should be allowed the plant for the performance of the feedwater heaters, but that the temperature of the feedwater should be taken only as it goes into the boilers at about 203 degrees, after passing through the feedwater heaters, not at about 78.9 degrees, as it comes from the city main. The expert testimony shows that on tests of the efficiency of boilers only the temperature of the water going into the boiler is read as it goes into the boiler, and that no credit is allowed on a test of a boiler alone for the performance of the feedwater heater (an accessory of the boiler) in previously raising the temperature of the water to that point. But, on the other hand, on tests of the efficiency of an entire plant (an over-all test, as they are sometimes called), the temperature of the water is read on the other side of the feedwater heater, and credit is allowed for the operation of the feedwater heater in raising the temperature of the water before it is fed to the boiler. As this is a question of the interpretation of the contract, and all such questions were reserved by the court, I have not passed on the respective claims of the parties."

There is another dispute between the parties as to the meaning of this steam production guaranty; the company claiming that, the basis of this guaranty being the weight of the refuse "consumed," it would mean the weight of the refuse fed into the furnace, less the weight of the unconsumed portion coming out in the residual as clinker and ash. The city, on the other hand, disputes this claim, and contends that the words "refuse consumed" in this guaranty means "refuse fed into the furnaces."

According to the master's report, the testimony of Dr. Rudolph Herring, Mr. Solomon, Mr. Dowd, and Mr. Primrose was that the weight of the residual should be deducted from the amount of refuse in order to ascertain whether there was a compliance with this part of the contract, and Messrs. Pool, Ashley, and Lederle, on the other hand, testified on behalf of the city, and in their opinion the correct way to compute steam production is on the weight of the refuse fed into the furnaces, without taking any account of the residual.

The provision of the contract is "per pound of refuse consumed," and it seems to me that much importance should be attached to the use of this word "consumed," because the very meaning of the word "residual," or "residuum," is that there is something left unconsumed. So that I am disposed to agree with the gentlemen who testify that it should be deducted before making the calculation.

The master finds in reference to allowance for wear and tear:

"As stated above in another finding, the contract provides that allowance shall be made for 'ordinary wear and tear' in determining fulfillment of the guaranties. The test of August 8, 1914, was run about a year after the plant had been put into operation, and during that time it had been subjected to hard usage. The city's printed specifications, section 4, allow for the annual depreciation of the plant as a whole, and the testimony shows that the efficiency of the plant as to steam production depreciates about 10 per cent. the first year and about 5 per cent. the next year, and can thereafter be maintained at that efficiency with proper care and expenditure for upkeep. That is to say, at the end of one year's operation 10 per cent. should be allowed for wear and tear, and deducted from the 1.96 pounds of steam per pound of refuse consumed, as guaranteed at the beginning, making that guaranty, with allowance for wear and tear, 1.764. At the end of the second year's operation a further 5 per cent. should be allowed for wear and tear, making that guaranty, with allowance for wear and tear, 1.666."

What the master finds is: That on the test of 24 hours of August 8, 1914, the total weight of refuse fed into the furnaces and incinerated was 278.89 tons. That the weight of the residual was 53.88. Deducting the weight of the residual from the weight of the refuse fed into the furnaces and incinerated, leaves 225.01 tons, on which the company claims the steam production should be based. He says:

"If, as the company claims, this was a plant test, so that the plant should be credited with the operation of the feedwater heater, and if, as the company claims, the steam production is based on the tonnage of refuse incinerated, less the weight of the residual, then the number of pounds of steam generated in the boilers, from and at 212 degrees Fahr. per pound of refuse, was 1.953, as compared with the 1.96 guarantied, without any allowance for wear and tear. This is less than the guarantied rate, without allowance for wear and tear, by .007 of a pound, or .36 of 1 per cent. This very small deficiency would have been more than made good, had it not been for the 53 tons of wet garbage in the bottom of the pit, and had the plant not been fed wholly with the wet garbage for several hours on Sunday afternoon, including 3,500 pounds of rotten watermelons. It was during this very period that the steam production noticeably fell off. With any allowance for wear and tear, the guaranty on this construction of the contract was exceeded. Furthermore, while the rate of evaporation fell below that specified by .36 of 1 per cent., the plant produced 11.1 per cent. more steam from the 278.89 tons of refuse incinerated than it would have produced from 250 tons, the guaranteed amount, at the guaranteed rate of 1.96 per pound, without allowance for wear and tear. In other words, there was available for power purposes from the plant, because of this increased capacity, 11.1 per cent. more steam than was required by the guaranty.

"If, on the other hand, as the city claims, this was a boiler test, so that the plant should not be credited with the operation of the feedwater heater, and if, also, as the city claims, the steam production is to be based on the tonnage of refuse incinerated, without deducting the weight of the residual, then the number of pounds of steam generated in the boiler from and at 212 degrees Fahr. per pound of refuse incinerated was 1.56. If the plant was given credit, as the company claims, for the operation of the feedwater heater, but the company's claim about the weight of the residual is not allowed, then the number of pounds of steam generated in the boiler from and at 212 degrees Fahr. per pound of refuse incinerated was 1.59. If, according to the city's claim, the plant is not given credit for the operation of the feedwater heater, but, according to the company's claim, the deduction of the weight of the residual is allowed, then the number of pounds of steam generated in the boiler from and at 212 degrees Fahr. per pound of refuse was 1.87."

I am perfectly satisfied, after examining carefully the evidence on the subject, that this plant will produce, in fair operation, the amount

of steam guaranteed in the contract. The test of August 8, 1914, as I have quoted it above from Mr. Solomon's report, was clearly not a fair test of what the plant could do, under all the circumstances, and even then it lacked a very trifling per cent. of coming up to the guaranty. I should find this to be true, even without the added observations of Dr. Coon and his associates on their test in May, 1915.

As to the guaranty of labor cost to operate the plant, I think the record shows that the 25 cents per ton guaranteed was sufficient for the cost of labor engaged in operating the plant. That is the labor actually employed in the plant.

In order to increase the draft from the furnaces and to assist in the destruction, or perhaps the nonaccumulation, of slag, the company installed what it called an induced draft fan. This induced draft fan is spoken of by the master in this way:

"This fan may be operated or not, as the operator desires, which is a valuable feature. When operated, it uses, for power to drive it, a very small percentage of the surplus steam produced in the operation of the plant. When operated, it increases the draft up the stack and draws off more rapidly from the furnace the gases produced by combustion. Now, since the fan has been installed, even when the passages through which the gases pass from the furnace up to the base of the stack may become partly stopped up by dust or slag, the draft is sufficient to carry off all the gases. The back draft, which formerly occurred at times when such passages became partly clogged up, is now prevented, and the excessive temperature in the furnaces and passages, the formation of slag which formerly resulted from such partial stoppage of the passages, now never occur. The installation of the induced draft fan overcomes many of the difficulties growing out of the mixture not approximating the test mixture, and improves the operation of the plant. The induced draft fan is not needed when the furnaces are running on a mixture of refuse approximating that specified in the contract."

It seems that this induced draft fan has two purposes, if I understand it; at least it is claimed that it brings about two results. One is its beneficial effect as to the accumulation of slag, and the other is as to helping the ventilation of the plant by preventing back draft. I do not see any reason whatever why this induced draft fan does not result in a beneficial effect on the plant. The city was notified by the company of the installation of this induced draft fan about December 4, 1914, but according to the testimony of the defendant's own witnesses it was completed and put into operation October 27, 1914. So far as I can ascertain, the specifications do not require the installation of this induced draft fan; but it was added voluntarily by the Destructor Company for the purpose of aiding in the satisfactory working of the plant.

I have had some doubt as to whether or not the date of the installation of this induced draft fan was not the time at which the contract should be considered as finally completed; but, while I think this induced draft fan was beneficial to the working of the plant, I do not think this voluntary addition by the company, as it seems from the evidence in the case to have been, would be such a part of the construction of the plant as would make the plant incomplete without it. I think it must be held that the plant was in a condition for useful operation in accordance with the contract, and was doing the work required by the contract on August 8, 1914, as shown by the test made

at that time under the observation for the company of Mr. Solomon, of the Solomon-Norcross Company.

I have not noticed the contention of the city that the city had the right, under the contract, to judge as to whether the contract was satisfactorily completed. The provision of the contract upon which this contention is based has already been quoted in full on page 757 above. It is perfectly evident, I think, from reading this provision of the contract, what was meant; that is, as the work progressed the city had the right to object to the character of the material used, the brick, iron, etc., and to the manner, to some extent, at least, in which the work was being done. This right the city exercised, as I understand it, in a number of instances, as to the window frames, the glass used in the windows, as to the kind of doors put in, and perhaps in other particulars; but when the work went on until the building was completed, the machinery put in and adjusted, and the claim made by the contractor that the plant was complete and ready for useful operation, and the city was not satisfied, then the question of whether there had been a complete execution of the contract on the part of the contractor should be determined by the three persons, as indicated.

Numerous authorities are cited by counsel for the city to the effect that where, in a case of construction such as this, the question of the satisfactory character of the work is left to an engineer or representative to determine, his judgment is final and conclusive. I do not differ with these authorities at all. They are fully recognized, but in this case, I think, so far as the judgment of the engineer or city official is concerned, it was as to the material and the work as it progressed, and that, when the contractor claimed that the work was completed and the city was not satisfied, then, in that event, the matter was to be left for determination to three gentlemen, to be selected and to test the plant in accordance with the provisions of the contract.

There has been some discussion in the case about the trolley hoists, and with reference to their efficiency in accomplishing the purpose for which they were put into the plant. I think there is some objection to the trolley hoists, but I do not think it is sufficient to cause a rejection of the plant. The trolley hoists are an appendage to the plant, lifting the refuse from the pit, into which it is thrown from the carts, and placing it over and emptying it into the furnace hoppers.

I do not think, as just stated, that this is a ground for the rejection of the plant, because it is clear that the Destructor Company made diligent effort to get the best apparatus of the kind that could be obtained, and it works very well when in operation. The difficulty about it is it breaks down oftener than it should for the proper operation of the plant. I think the Destructor Company should be required to remedy this.

In Dr. Coon's report for the commission appointed by this court, he says this:

"A specific contention of the city was that the trolley hoists operating the grab buckets which hoist the refuse from the garbage pit and dump it into the furnace hoppers frequently break down, and thus cause delay, trouble, and needless expense. It is needless to state that these hoists operate under very trying conditions. They must be dust and heat proof. If these hoists

are not the very best that can be procured, the Destructor Company should be required to furnish them. In our opinion the city should require the Destructor Company to provide for these hoists completely inclosed motors with waste-packed bearings."

This is a matter that must be determined, however, in forming the decree. The trolley hoists now in use have enabled the company to destroy all of the refuse furnished by the city during the entire period they have been running it, but still I do not think they can be held to be entirely satisfactory as they are.

[3] There is a claim on the part of the defendant, in the printed argument by counsel, that the city is entitled to some recovery, under the provisions of the contract, against the Destructor Company for the nonfulfillment of its contract at the time specified in the contract. As I understand it, the contract was to have been completed and the plant ready for useful operation on August 15, 1913. As a matter of fact the city commenced to deliver refuse at the plant on August 18th, only three days after the time when, according to anybody's contention, the plant should have been completed. In view of this fact, I do not see how the city can justly make such claim. Of course, the purpose of making this provision for damages and agreeing upon the amount of damages per day for the noncompletion of the contract was the fact that the city would be deprived of the use of it, and where they went almost immediately into the use of the plant, by delivering the material there and having it disposed of, they ought not fairly to be allowed this claim. It is true that, to put the plant in a perfectly satisfactory condition, certain changes and additions were necessary, which prevented its final completion and compliance with all the guaranties of the contract until after the test made in August, 1914, which was supervised by Mr. Solomon, of the Solomon-Norcross Company, and it was then practically and substantially completed in accordance with the requirements of the contract.

So far as I can ascertain them, I have gone over the objections made by the defendant to the action of the master in admitting or rejecting testimony, and I am inclined to think that counsel for the Destructor Company are correct as to a great many of them, that there was no exception noted at the time that the master ruled, which would seem to affect them as much as it would objections made to testimony in court and the action of the court not excepted to and noted at the time. But this is immaterial, because I do not find that any of the testimony admitted or rejected is such that the master's action affected the result of the case. The testimony is, I think, abundant upon the main points in the case and which control it, and fully justified the master's conclusions. Consequently his admission of testimony or his rejection of testimony which would not have altered the result is immaterial on this hearing. The objection, for instance, to evidence in reference to the old contract, it seems to me, could not have affected this hearing in any way. The city wanted to introduce evidence, at one time, as to the cost of the building. This was objected to, but it is stated no exceptions were noted. Whether there were or not, the evidence would not change the result of this case, because the plaintiff

can recover only the contract price and such expense of operating the plant as may be found. The objection to Dr. Herring's qualification to testify as an expert, and evidence showing that he had been in the city's employment, I do not think is meritorious, because his testimony shows that he had had large experience, and so far as I have been able to examine his testimony, he testified to matters as to which he certainly had knowledge, information, and experience to justify his testimony. As I understand, it was also objected that he was allowed to testify that this plant was a substantial compliance with the contract. I think this testimony was competent; but, whether it was or not, the matters that I have determined show, I think, satisfactory and such compliance with the contract as justifies a recovery. All of these exceptions must be overruled.

[4] During the progress of the case, the court, upon a showing made by the company, claiming that the plant was completed, but that the city refused to act with the company in arranging for a test by appointing some one to represent it, I appointed three gentlemen to make this test, as has already been stated. I acted, as stated at the time, very largely on the authority of the decision of the Circuit Court of Appeals for the Eighth Circuit in the case of Castle Creek Water Company v. City of Aspen, 146 Fed. 8, 76 C. C. A. 516, 8 Ann. Cas. 660; but it seems to me, under the facts of this case, and the situation of the parties, to be entirely within the scope and power of a court of equity to appoint such a board of commissioners. These gentlemen, as conceded by everybody interested, were entirely disinterested, all gentlemen of ability and of the highest standing. Their report is in the margin.[1] While I have reached my conclusions on this case from the report of the master and the evidence before him, the report of the test made by these commissioners is exceedingly valuable in determining the question raised as to the completion of this plant in accordance with the contract.

One of the main contentions in the case is as to the capacity of the plant to destroy 250 tons of refuse every 24 hours. As a result of their test the commission says:

"The contract calls for the plant to 'be capable of destroying in normal operation 250 tons of refuse per 24 hours.' The test gave a rate of 273.5. The contract is thus exceeded by about 9.5 per cent. If the Destructor Company had chosen to do so, they could have burned up all the refuse over an hour before they did, thus raising its capacity, on the specified mixture, to about 293 tons per 24 hours. They delayed the rate of combustion in order to raise the rate of evaporation. They consulted us as to whether they would be permitted to do this, and we consented to it."

On the question as to whether the refuse going into the incinerator was completely destroyed, they say that the amount of refuse not destroyed was ".005 of 1 per cent. of the refuse burned, or say .025 of 1 per cent. of the clinker." I think we may safely conclude that, when we have complete co-operation, even this small percentage of unburned material will be greatly reduced, if not entirely eliminated.

They also consider the clinker excellent for road making and con--

[1] See report as set forth just preceding the opinion of the court.

crete work. They find favorably to the company on the matter
of combustion on the grates. They say, as to the changes in the
furnaces, that they are "unable to see that the city has just ground
for complaint in this respect." They state, as to the temperature of
the combustion chambers, which under the contract must not drop
below 1,250 degrees F.:

"At no time during the run did they observe the temperature as low as
that. During the special mixture test the average temperature was 1,615
degrees F."

They state that, in their opinion, the clinker should be deducted
from the refuse fed into the furnaces, in ascertaining whether or
not the contract was complied with as to the production of steam.

They find that the time of the completion of the plant should be
held to be "when it stood structurally and mechanically as it did
May 24, 1915." That is the time at which the city should have ac-
cepted it, and from which time they should be required to pay inter-
est, and any additional cost of operation, was when the plant was
in the condition they found it when their test was made in May, 1915.

This report strengthens very materially the conclusions reached
by the master from the testimony before him. I think the com-
pany is entitled to a decree that the plant was completed on Au-
gust 8, 1914, in accordance with the contract; that at that time
it was complete and ready for useful operation; consequently they
are entitled to a decree against the city for $135,000 and interest
from August 8, 1914.

They will also be entitled to recover for the cost of operation
over and above the 25 cents from December 19, 1914; also for the
cost of ordinary current repairs, such as the city would have made
if they had been operating the plant, from the same date. This
time is fixed as the date from and after which they should recover
the extra cost of operation over the 25 cents, and the cost of usual
and ordinary repairs, because, so far as I can ascertain from the
record, the letter written by the Destructor Company on Decem-
ber 4, 1914, was the first notice the city had of any such require-
ment on the part of the company. In this letter the company says:

"Now that our contract is clearly completed, we notify you that if you
wish us to continue operation after December 19, 1914, you must pay us
from then the actual cost of operation, 53 cents a ton."

I do not mean to say that the company is entitled to recover 53
cents a ton, because it is not satisfactorily shown by the evidence
here that it actually costs that much. These amounts should be
determined at once by the court upon proper proof submitted, or
by reference to the master at once, so as not to delay a decree in the
case.

In reference to the claim of the city against the Destructor Com-
pany for $356.58, cost of collecting garbage for the February, 1914,
test, the master finds in one place that the failure to run this test
was due to the condition of the weather, and in another place that
the failure to run a test from December to March was due to the
fault of the city. I think it is clear from the evidence that the mas-

ter has found correctly that the failure to have the test in February, 1914, for which this charge for collecting refuse was made, was due to weather conditions, and no fault of the company, and that this is sufficient to prevent the city from recovering this amount against the Destructor Company. It will not, therefore, be deducted from the amount which the Destructor Company is entitled to recover against the city, when the same shall have been ascertained in the manner indicated.

There were certain charges made for water used at the plant, for which the city deducted certain amounts from the bills rendered by the Destructor Company for the 25 cents a ton for operation. This is held to be a necessary part of the operation of the plant over and above the 25 cents per ton for labor used in the plant, and the Destructor Company will be allowed to recover the amount thus deducted by the city from its bills as rendered.

I may add to all that has been said above that the manner in which this plant has destroyed the refuse of the city during the past year and a quarter seem to show clearly that the city must necessarily take it and pay for it; the only real question being as to what it should pay for the extra cost of operation from the time stated, and the matter of the satisfactory working of the hoisting apparatus to which I have referred. The trifling amount of refuse which is not completely destroyed, as has been discussed, is not sufficient to justify any serious objection to the working of the plant, and the steam production being satisfactory, although it is not used at all now, there is nothing left as to which there ought to be any reasonable discussion.

As soon as the amount which the plaintiff is entitled to recover, if anything, for excess cost of running the plant, and for usual and ordinary repairs, as indicated herein, is determined, a decree may be entered in accordance therewith.